1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7

STEVEN IRVING WEISSMAN,

Case No.  22-cv-04005-WHO

8

Plaintiff,

9

v.

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

10

KEN CLARK,

Re: Dkt. No. 1

11

Defendant.

12
13

**INTRODUCTION**

14

Petitioner Steven Weissman seeks federal habeas relief from his state conviction on five

15

separate counts for lewd acts on minors and aggravated sexual assault of a minor because the

16

prosecutor committed misconduct, trial counsel rendered ineffective assistance, the trial court

17

failed to give proper instruction, and the multiple errors were cumulatively prejudicial.  After a

18

thorough review of the record, I conclude that each claim is meritless.  For the reasons set forth

19

below, the petition for such relief is DENIED.

20

**TRIAL BACKGROUND**

21

In 2016, a Santa Cruz County Superior Court jury convicted Weissman of 14 counts

22

involving lewd acts on minors or aggravated sexual assault of a minor.  Weissman Habeas Petition

23

("Petition") [Dkt. No. 1] at 2-3.  The state appellate court summarized the facts underlying the

24

crimes as follows:

25

**A. Victim K.C. (Aggravated Sexual Assault (Count 7) and Lewd Act (Count 9)); 1997-1998)**

26

K.C. was born in 1988.  Defendant was a yard duty supervisor at K.C.'s elementary school.  K.C. became friends with defendant's adopted son, Charlie

27
28

Weissman.[1]  K.C. was invited to go with Charlie and defendant to "see a movie that had just come out called The Borrowers."  Defendant sat between K.C. and Charlie during the movie, which K.C. thought "strange."

The following week, defendant invited K.C. to defendant's home to play with Charlie.  At defendant's home, defendant took K.C. to see defendant's snakes in his garage.  After they had looked at the snakes for a while, defendant said to K.C.: "I want to see your weiner."  Defendant unbuttoned and unzipped K.C.'s pants and pulled them down.  Defendant then pulled down his own pants and pulled his penis and testicles out of his underwear.  He told K.C. to open his mouth, and defendant forced his penis into K.C.'s mouth.  K.C. tried to pull away, but defendant overcame his resistance and told him to "suck it like a lollipop."  K.C. continued to resist, and he was able, after about 20 seconds, to push defendant away.  Defendant told K.C. to pull up his pants, and he said "that I was being a bad boy and not to tell anybody . . . ."

K.C. felt "afraid and ashamed."  He thought if he told anyone he would be punished for having done something wrong.  K.C. avoided defendant and Charlie after this incident. K.C. did not tell anyone about this incident until 2007 when he was 18 years old.  The first time he told anyone anything about it was when he and his close friend, Daniel C., had taken LSD and K.C. had drunk some whiskey.  The LSD did not cause K.C. to have hallucinations, but it "made me feel a little bit loose I guess." K.C. cried and told Daniel that when he was "a little boy" a "neighbor" who "would watch him from time to time" "hurt him." K.C. did not tell Daniel anything else about the incident.  K.C. "had a great sense of relief" after this disclosure.

Not long after telling Daniel, K.C. told his then-girlfriend. A couple of years later, K.C. told his mother that defendant had molested him.  K.C. also told two subsequent girlfriends and his father.  K.C. was drunk when he told his mother and when he told his father.  K.C. told another girlfriend in 2009, but he did not identify the perpetrator.

K.C. did not want to tell the police because he did not want to relive the experience or go into a courtroom.  However, after K.C. heard that defendant had been arrested in 2013 for molesting another child, he felt that he needed to come forward.  When K.C. first talked to the police, he did not mention the LSD because he was afraid he would get in trouble.

**B. Victim R.A. (Lewd Act (Count 20); 2003-2006)**

R.A. was born in 1991.  When he was eight or nine years old, R.A. became friends with Charlie.  Defendant was a yard duty supervisor at the elementary school that R.A. and Charlie attended.  Charlie invited R.A. to his home, and R.A. came over and played with Charlie.  R.A. sometimes helped defendant with his snakes.

On one occasion, after R.A. told defendant that his back hurt and was stiff,

---

[1] Charlie testified that he did not know K.C., had not been in any class with him, had never had K.C. over to his house, and had never gone to a movie with K.C. and defendant.

defendant asked R.A. if he wanted defendant to "crack" R.A.'s back.  R.A. said "okay," so defendant had R.A. sit on his lap facing away from him.  R.A.'s buttocks was pressed against defendant's groin.  Defendant grabbed R.A.'s arms and then his knees and rocked back and forth three times.  R.A. thought this was "kind of weird" and "wiggled" away.  It did not help his back.

About a year later, when R.A. was 12 or 13 years old, R.A. spent the night at defendant's home.  In the night, R.A. wandered into the master bedroom where defendant was using his computer.  R.A. asked defendant about the Tempurpedic bed, and defendant invited him to lie down on it.  R.A. fell asleep on the bed for 10 or 15 minutes and awoke to find defendant lying "right behind" him and "spooning" him.  Defendant's body was in contact with R.A.'s body from defendant's chest to defendant's knees.  R.A. could feel defendant's erect penis poking him.  When defendant realized R.A. was awake, he immediately got up.

**C. Victim S. (3 counts of Lewd Act (Counts 16, 17, and 18); 2005-2008)**

S. was born in 1997.  Defendant was a yard duty supervisor at S.'s elementary school, and S. met defendant in 2005 when S. was eight years old and in third grade.  Like some of the other boys defendant abused, S. lived with his mother, and his father was no longer involved in his life.  S. saw defendant as a "father figure."  Defendant told S. that he had previously been married, which was not true.  Defendant invited S. to his home to help him with his snakes.  S. started coming over to defendant's home three or four times a week.

S. and defendant would greet each other with "[l]ong-lasting deep hugs."  One time, defendant gave S. "a quick kiss" on the lips after giving him a hug.  S. did not see defendant hug other boys.  S. sometimes sat in defendant's lap.  S. would "[h]ang out" and watch television at defendant's home, and go places and "get food" with defendant.

S. began spending the night at defendant's home in 2005 after they had known each other for a couple of months. The first time S. spent the night at defendant's home, defendant offered eight-year-old S. a sleeping pill.  Although defendant offered sleeping pills many other times, S. only sometimes took them.  S. and defendant always "would sleep in the same bed together" when S. spent the night.

Sometimes defendant gave S. massages in the bed, during which he massaged S.'s back and legs, but not his buttocks.  The massages happened two or three times a week for three years.  Over time, S. noticed that defendant made "inappropriate jokes" about women's bodies and "talk[ed] about sex," "heterosexual talk."  Defendant also told S. 20 times that he wanted S. to get circumcised. He told S. that his penis would "stay small and it would never grow to full size" if he did not get circumcised.

When the two of them watched television, they would sit next to each other and "kind of snuggle."  Defendant frequently rubbed S.'s legs "[s]ensually,"

United States District Court
Northern District of California

including his thighs.[2]  During a trip with two other boys, S. saw defendant pull down the sheets covering the other two boys and take photos of them as they slept.

In the fall of 2007, one of defendant's fellow yard duty supervisors heard S. conversing with defendant.  Defendant asked S. " 'Do you plan on spending the night at my house?' " S. responded: " 'Yes, if you don't get drunk.' " She reported this conversation to the principal, who contacted child protective services (CPS).  The principal terminated defendant without giving a reason, and defendant became very upset.  He continued to come to the school to pick up S.

In 2008, S. found a "spy camera" hidden in a radio in the bathroom at defendant's house.  The camera was aimed at the toilet and the shower, which had a clear shower curtain.  S. discovered that the camera was linked to defendant's television.  S. considered that "it was just the last straw, where I realized that he is a pedophile." About two weeks later, he told his mother about the camera "and that I was pretty sure that he was a pedophile." However, he did not provide her with any information about the interactions between him and defendant.   S.'s mother confronted defendant, and defendant admitted that there was a camera in the bathroom.

S.'s relationship with defendant ended in 2008.  After defendant was arrested, S. did not want to come forward, even after the police tried to contact him, because he felt "incredibly guilty" and did not want to talk about it.  He testified at trial "under subpoena" and did not "really want to be here."

### D. Victim T.B. (Two counts of Lewd Act (Counts 12 and 13); 2013)

T.B. was born in 2003.  His mother physically abused him, beating him with shoes, belts, and other objects.  When he was two or three years old, T.B.'s mother was giving him a bath and washed his penis with her hand in a way that made him "uncomfortable." There was nothing "sexual" about the incident.[3]  He pushed her hand away and said "No." T.B. developed "anger problems" arising from his mother's physical abuse.

While he was living with his mother, T.B. was hearing voices and "seeing things that weren't there."  He "would see like dead people on walls."  T.B. was half aware that the things he was seeing and hearing were not real.  In 2010 or 2011, T.B. stopped living with his mother and went to live in a group home and then with his father and stepmother.  He did not see or hear things that were not there while he was living with his father or thereafter.  Unfortunately, his inability to control his anger made it impossible for him to continue living with his father.  His father had to call the police and have him removed in late 2011. T.B. was placed in hospitals and mental hospitals for some time and prescribed medications to help stabilize him.  T.B.'s medications included a "mood stabilizer," another medication "to keep me

---

[2] S. denied that his trial testimony was the first time that he had used the word "sensual."

[3] On cross-examination, T. testified that he originally thought his mother's touching of his penis was sexual but then realized that it was not.

calm," a medication for "the voices I used to hear in my head," and another "to help me go to sleep."

On June 10, 2013, 10-year-old T.B. came from a mental hospital to stay at defendant's house as a foster placement. T.B. was not having any problems with hearing voices or seeing things that were not real while he was at defendant's home or when he was at the mental hospital before going to defendant's home. T.B. slept in the guest room at defendant's home, but he used the bathroom in the master bedroom because the other upstairs bathroom was devoted to defendant's cats' litter box. The master bathroom had no door, so defendant could see T.B. when he was using that bathroom.

When T.B. went to sleep in the guest bedroom, he would close the door and cover himself with the blankets.[4] However, sometimes he would wake up and find the door open or the blankets removed. This happened three or four times. One night a few days after he arrived at defendant's home, about 45 minutes after he went to bed, while he was only partway asleep, he heard the door open and felt someone sit down on the foot of his bed and pull down his blankets. T.B. stretched his legs, and his leg hit another person's body. He then felt a person put a hand inside his underwear and start rubbing his penis. Although T.B. could not see the person's face in the dark, the only other person in the house was defendant. The rubbing continued for three or four minutes. T.B. was afraid to open his eyes, but he eventually opened his eyes and moved around, which caused the person to get up, look around the room, and then leave.

A similar event happened on another night, but this time defendant looked around T.B.'s room before he sat down on T's bed. Defendant seemed to be mumbling, and, when he sat on the bed, "it sounded like he was talking to someone," though there was no one else in the room besides T.B. The touching of his penis was shorter the second time because T.B. moved around more quickly.[5]

Three days after T.B. arrived at defendant's home, a seven-day notice for change of placement was given by either defendant or the agency that had placed T.B. in defendant's home. T.B. was removed from defendant's home on June 20, 2013, after being there for 10 days. T.B. was interviewed by CPS on August 20, 2013 and asked if defendant had touched him. T.B. said no because he was too scared and embarrassed to talk about it. T.B. also told his father that defendant had not touched him.

At some point, T.B. saw on the news that defendant had been arrested and charged with sexual molestation. He started having "flashbacks" and "dreams" about defendant molesting him. About six months later, T.B. told his social worker, a

---

[4] T. testified that in June it was hot in Santa Cruz, but "the AC was on at night, and it got cold in the house."

[5] Although T.B. thought there were one to three additional times that defendant touched T.B.'s penis, he could not remember those events.

woman he trusted, that defendant had molested him.  He later made a videotaped statement to an investigator in Modesto, and after that spoke to the prosecutor and his investigator about the molestations.

**E. Victim A. (Two counts of Lewd Act (Counts 10 and 11); 2013)**

A. was born in 2004.[6]  A.'s mother enrolled A. in the Big Brothers Big Sisters program, and defendant was assigned to be A.'s Big Brother in May 2013.  Defendant and nine-year-old A. met once a week, usually at defendant's house.  After a couple of months of these visits, defendant asked if A. could spend the night at his house on July 30, 2013.  A.'s mother agreed, and A. spent that night at defendant's house.

When A. was getting ready to go to sleep that night, defendant said he would give A. a massage.  Defendant gave A. a massage on the middle of his back over his pajamas and the blankets.  Afterwards, defendant got off the bed and tapped A.'s back and butt lightly.  A few days later, A.'s mother learned that defendant had been "accused of doing something he wasn't supposed to with kids."  A.'s mother asked A. if defendant had touched him when he spent the night, and A. confirmed that defendant had touched him.

**F. Victim J.K. (Three counts of Lewd Act (Counts 1, 2, and 3); and one count of Lewd Act on a Child of 14 or 15 (Count 5) (2008-2013)**

J.K. was born in 1999. In 2008, when he was eight years old, he and his mother were "very poor," and his mother "was working all . . . the time." J.K. had never met his father. Defendant was living in the same neighborhood as J.K., and J.K. met defendant through another young boy named "Sam" who knew defendant. When J.K. was nine or 10 years old, defendant offered to take J.K. and Sam to the Boardwalk, and they went. Afterwards, defendant took J.K. to defendant's house to see his snakes.

Within a month or so, defendant began paying J.K. to help him with his snakes. J.K. started spending a lot of time at defendant's home, watching television and eating, and sleeping over, and defendant would also take J.K. to the movies and to "the pool." J.K. did not like being at his own home because his mother "was always really angry and there wasn't enough food." J.K. saw defendant as "like a father figure."

At some point early on in the relationship between J.K. and defendant, J.K.'s mother became suspicious that defendant was "a pedophile" after she received an anonymous telephone call, but she eventually decided that it was okay for J.K. to continue to spend time with defendant. J.K. understood "pedophile" to mean someone who was "sexual towards a child."

Defendant customarily hugged J.K. when he arrived and when he left defendant's home. There was nothing sexual about these hugs. Defendant also hugged his friends and relatives when they arrived and left. Defendant also had other physical contact with J.K. Three times, when they were watching television, J.K. sat

---

[6] A.'s last initial is not in the record.

on defendant's lap. Defendant at times would kiss J.K. on the forehead when he left the house. J.K. had a lot of back pain, and defendant often massaged J.K.'s upper back (a few times a month) when J.K. was in middle school.

After a while, defendant began to "pressure" J.K. to spend more time at defendant's home and to spend the night more often. Defendant took J.K. and others on "trips to the desert," and he bought J.K. an iPod and a computer. When J.K. was in eighth grade, defendant told him that he would buy him a new wetsuit if he would spend the night once a week. Defendant controlled J.K.'s cellphone account and once cut off J.K.'s cellphone because he was upset at J.K. Defendant told J.K. that he had $3 million, that he would pay for J.K.'s college, and that his will would leave J.K. $1.5 million.

J.K. usually slept in the master bedroom of defendant's home, and defendant "was supposed to sleep downstairs." Sometimes J.K. woke up and found defendant sleeping in the same bed with him. J.K. told him not to do that, but it continued. About 10 times a year, J.K. would find defendant in bed with him. A few times J.K. was awake at 3:00 a.m., and defendant gave him "a piece of a sleeping pill" and told him to take it.

In 2011, when J.K. was in sixth grade, he awoke in the middle of the night to find defendant "trying to get my penis out of my pajama . . . pants . . . ." Defendant did not actually touch J.K.'s penis.[7] J.K. "yelled at him saying I'm leaving in the morning and that he's a pedophile . . . ." However, he continued his relationship with defendant. J.K. tried to block this event out of his memory because he could not accept that he "had been spending the night at a pedophile's house . . . ."

In 2012, J.K. turned on a television in defendant's bedroom and saw a camera that was showing a toilet. Defendant saw him make this discovery and told him that he "didn't see anything." J.K. stopped coming to defendant's home for a while, but he then resumed coming there. In late July 2013, J.K. told his doctor about defendant, and his doctor warned him to be "really careful" and be "looking out for red flags."[8] J.K. understood the red flags to be "[a]bout him being a pedophile."

In early August 2013, the day before J.K.'s 14th birthday, defendant had some friends over to play poker. After the friends left, defendant was "acting really weird to me" and "kind of creepy." Defendant was not a big drinker, but that night he had had several alcoholic drinks. Defendant told J.K. to go to bed, and J.K. did so. J.K. covered himself with a sheet and two blankets, but he stayed awake with his eyes closed to see "what happens."

J.K. was still awake but with his eyes closed when, around 3:30 a.m.,

---

[7] The jury deadlocked on the count associated with this conduct.

[8] J.K.'s doctor testified at trial and confirmed that he had warned J.K. about expensive gifts from an older man. He had asked J.K. if he had been sexually touched, and J.K. had denied that he had been.

defendant came into the bedroom, turned on the lights, and then moved around the bedroom for a while. After doing so, he moved J.K.'s blanket down "to just above waist level," and moved J.K.'s arm off of his chest. Right after doing so, defendant got into the bed next to J.K., pulled a sheet up over himself, and started masturbating about a foot away from J.K. J.K. heard the sounds of defendant masturbating, looked over at defendant, and saw defendant staring at him. J.K. jumped out of the bed, pulled down the sheet, and saw defendant's partially erect penis protruding from his boxers. Defendant tried to cover himself with his hands. J.K. asked defendant what he was doing. Defendant denied doing anything, but he stood up and a used condom fell out of his hand. J.K. ran out of the house, went home, and immediately told his mother what had happened. J.K. told his mother "Steve is a pedophile."

J.K. was interviewed by law enforcement later that day. Part of his motivation for reporting defendant's conduct was that he knew that defendant was a "Big Brother" to A. J.K. told law enforcement that defendant was drunk the previous night, and he explained that he believed that "people who are pedophiles . . . repress it" and it "comes out more" when "they drink." "[H]e was acting weird cause he was drunk." Over the next couple of days, J.K. was interviewed twice more about his relationship with defendant.[9] He told the police what he could remember, but he said "I keep remembering more." He did not tell the police about the 2011 pajama incident and denied to them that there had been any touchings before August 2013.

J.K. testified at trial that he did not tell the police about the pajama incident or the camera incident because he "thought it would make me sound dumb, if I stayed around there after that." He first disclosed those incidents a week before trial, on August 4, 2016. He told the prosecutor and his investigator that he had just remembered those incidents a month earlier. J.K. had considered filing a lawsuit against defendant "for emotional damages." "I deserved some money. This ruined my life." J.K. did not know K.C. or R.A., but he had met T.B. when T.B. was at defendant's home. J.K. had also seen S. once at defendant's house.

### G. Other Prosecution Evidence

Defendant's computers were seized by the police on August 5, 2013. Condoms were found in defendant's bathroom. A forensic search of defendant's computers did not turn up any child pornography. The computers were also searched for any instance of the word pedophile or pedophilia. J.K. had a user account on one of the computers, which appeared to be a computer devoted to "gaming." That computer had no mention of pedophile or pedophilia.

The other computer had only one user account, named "Steve." On that computer, the forensic search turned up a Google search for "pedophiles" from March 8, 2013. Similar searches had occurred on that computer on March 10 and March 13, 2013 for "pedophile." The forensic search also found four articles on that computer's hard drive that contained the term "pedophile." One of the articles appeared on the hard drive on May 31, 2013. Three other articles appeared on the hard drive on July 31, 2013, and they all concerned pedophilia. In the "unallocated

---

[9] These interviews were recorded and played for the jury at trial.

United States District Court
Northern District of California

space" on the computer, there were several additional references to pedophilia. The presence of these articles and other references showed only that someone had clicked on a link to that material. There was no indication of whether the computer was password protected.

Ellen Buckingham, a former neighbor of defendant, testified that her son had gotten to know defendant and had begun spending time at defendant's home in the mid-1980s. Her son started spending the night at defendant's home when her son was 10 years old. Once, when defendant's parents were visiting, defendant asked Buckingham to masquerade as his girlfriend to "appease" his parents, who "were concerned he didn't have a girlfriend." She did so. Buckingham's son spent the night at defendant's home a number of times, but Buckingham eventually limited and then cut off contact between her son and defendant because she learned that her son and defendant were sleeping in the same bed. Defendant was angered by her restrictions, and she ultimately had to get a restraining order against him.[10]

Sibylle Peters was defendant's friend and housecleaner. They remained friends for 18 years, and she continued to clean his house throughout that period. They never had a romantic relationship. Her son became friends with Charlie, and this led to her son spending the night at defendant's home frequently beginning sometime around 1998. After defendant was arrested, he told Peters that he "was freaked out that he made a mistake." He told her that he "was drinking, and J[.K.] was on the bed already, and he was jacking off." Defendant was interviewed by the Sheriff's Office on August 5, 2013. He was asked if he was in a relationship, and he said he was in a relationship with Peters, though it was "not really serious."

**The Defense Case**

A defense expert testified about the effects of LSD and alcohol. He opined that LSD "distorts" memory. When LSD is combined with alcohol, "[i]t makes memories even more questionable." LSD can produce "false memories" while the user is under the influence of the drug. These are largely false memories of the time spent on LSD, including altered perceptions, though LSD could distort memories of the past at least while the user is on LSD. When a user does not experience visual distortions, that probably means that the dosage was low. A low dosage is less likely to distort memory. LSD users generally are aware afterward that their altered perceptions were not accurate. LSD does not affect the "retrieval of memor[ies]" from a time prior to the use of LSD.

Buckingham's son, D.B., who was born in 1979, testified for the defense. D.B. testified that he "kind of latched onto [defendant] as a father figure" when D.B. was a boy and defendant was his neighbor. D.B. believed that his mother and defendant were dating. D.B. continued to "hang out" with defendant even after they were no longer neighbors. He spent the night at defendant's home many times, and he sometimes slept in the same bed with defendant. D.B. saw other adults, both male and female, at defendant's house regularly. Defendant never touched D.B. inappropriately. Richard Martinez, who was born in 1969, testified that he met

---

[10] In 1993, 1996, and 1997, defendant violated the restraining order by harassing Buckingham.

defendant when he was 13 or 14 years old and defendant was in his 20s. Martinez frequently visited defendant's home in the 1980s and 1990s. Defendant never touched him inappropriately. Martinez saw defendant less frequently after the early 1990s, and he last saw defendant in 2011. Several other boys who had spent the night at defendant's home testified that he had never touched them inappropriately.

Leslie Karst testified that she met defendant when they were in college at the University of California at Santa Cruz. She and defendant remained friends with each other thereafter and with numerous other college friends. Karst had visited defendant's home on average about twice a month from 1990 until his arrest. She had never seen defendant touch a child inappropriately.

Petition. Ex. A ("State Opinion") at 3-16.

### POST-TRIAL PROCEEDINGS

After the verdict was returned, Weissman moved for a new trial. The court held an evidentiary hearing on several claims, including that the prosecutor had interviewed an excused juror during trial, that the prosecution failed to disclose benefits to T.B. after he testified, that Weissman's counsel failed to investigate an arrest of T.B., and that the prosecutor failed to disclose a statement by R.A. and correct his known false testimony. Ultimately, the court dismissed Count 8 (oral copulation for K.C.) on *ex post facto* grounds and denied the rest of the motion. (25RT 6011-14). In 2018, Weissman was sentenced to 105 years, 8 months to life. (27RT 6516-18, 5CT 1292-96).

Weissman filed a timely appeal. In 2021 the Sixth District Court of Appeal reversed the conviction on nine counts (Counts 1, 2, 3, 10, 11, 16, 17, 18, and 20) based on the prosecutor's failure to correct R.A.'s false testimony under *Napue v. Illinois*, 360 U.S. 264 (1959). The court found the *Napue* error harmless on the remaining five counts, rejected other claims of constitutional error, and remanded the case with directions to allow the District Attorney to elect whether to retry Weissman on those counts or otherwise for the court to resentence him on Counts 5, 7, 9, 12, and 13. *See* Petition at 3.

Weissman filed a timely petition for review of the challenges to the remaining convictions, which the California Supreme Court denied without comment. *Id.* Ex. B. On remand, the nine charges were dismissed, and Weissman was resentenced to a total term of 30 years, 8 months to life on the remaining counts. *Id.* Ex. C. This habeas petition followed.

United States District Court
Northern District of California

United States District Court
Northern District of California

**STANDARD OF REVIEW**

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), this court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

**DISCUSSION**

Weissman's petition contains claims for prosecutorial misconduct, ineffective assistance of counsel and judicial error for failure to give a required jury instruction. He also claims that these flaws, together, create cumulative error. None of the claims, considered separately or together, allows the petition to be granted. I address each claim in turn, reciting the relevant facts when I address the claim.

# I.   PROSECUTORIAL MISCONDUCT

Weissman asserts that the prosecutor committed misconduct by (i) failing to correct R.A.'s known false testimony; (ii) improperly debriefing an excused juror before his closing argument; (iii) failing to disclose gifts to a witness in violation of *Brady*; and (iv) vouching for evidence and violating the witness-advocate rule.  Weissman also contends that he was deprived of effective assistance of counsel regarding (iii) and (iv), above, because his counsel did not object to the prosecutor's alleged misconduct.

## A.   Failure to Correct Known False Testimony

### 1.   Background

R.A. changed his testimony on the witness stand.  Before trial, R.A. had never mentioned that Weissman's penis was erect during the "spooning" incident.  *See* State Appellate Court Opinion ("State Opinion") [Dkt. No. 1-1] at 32.  On direct examination, R.A. said nothing about an erection.  *Id.*  But on cross-examination, R.A. testified that he had felt Weissman's penis during the spooning incident and that he had told the prosecutor about it.  That was false.  But the prosecutor stayed silent and did not correct the record.  He later admitted that R.A. had not told him or his investigator prior to trial that R.A. had felt an erection when Weissman spooned him. *Id.*

Employing the standard set by the Supreme Court in *Napue v. Illinois*, the state court found that the prosecutor's failure to correct R.A.'s false testimony about R.A.'s memory of what he had previously reported to the prosecution was prejudicial with respect to nine counts where an inference of sexual intent was derived from R.A.'s false testimony because the jury's verdict was not "surely unattributable" to R.A.'s false testimony.  State Opinion at 32, 35; *see also Napue v. Illinois*, 360 U.S. 264, 269 (1959).  The court held that it was not prejudicial for the remaining five counts where R.A.'s testimony was not material because evidence of sexual intent was overt.  *Id.*[11]

---

[11] The state court rejected the Attorney General's argument that because Weissman "had the opportunity to cross-examine and test the witness's credibility and in fact did so," the prosecutor's error was categorically harmless beyond a reasonable doubt.  The court found that Weissman's ability to "'test the witness's credibility' was hamstrung by R.A.'s false testimony coupled with the prosecutor's failure to correct R.A's false testimony."  State Opinion at 30:10-13.  It determined that "[h]ad the jury known about R.A.'s claim to have told the prosecutor about defendant's erection prior to trial was false, it might have doubted the reliability of R.A.'s claim

The court rejected the Attorney General's argument that the error was harmless beyond a reasonable doubt concerning the first nine claims because those claims pivoted on whether sexual intent could be inferred from the presence of an erection during the spooning incident. *Id.* at 36 ("[l]ike some of the other counts, the spooning count, in the absence of the erection testimony, involved conduct that in and of itself did not necessarily demonstrate a sexual intent."). It explained that because Weissman's defense to the spooning and other similar counts was that he lacked the requisite sexual intent for charges of lewd acts involving a minor, and the erection testimony provided very strong evidence that he did have the requisite sexual intent, the testimony raised a reasonable inference that Weissman "harbored the same intent" when engaged in similar conduct. *Id.* For these reasons, the state court was unable to find that the jury's verdicts on the spooning count and the other similar counts were "surely unattributable" to the prosecutor's failure to correct R.A.'s false testimony. *Id.*

Weissman's claim now concerns the court's decision on the remaining five counts. The court upheld them because they "bore no similarity to the spooning count," as "[t]he evidence of defendant's sexual intent for the acts upon which [the remaining] five counts were based was so overt that the jury's verdicts on these counts were surely unattributable to the prosecutor's failure to correct R.A.'s false testimony." *Id.* at 36. For the two counts that alleged Weissman forced K.C. to orally copulate him, the two counts involving touchings of T.B.'s penis, and the final count concerning Weissman masturbating in bed with J.K., it found that "the *Napue* error was harmless beyond a reasonable doubt because these counts were not similar to the R.A. [spooning] count and proof of defendant's sexual intent could not have depended in any way on an inference from R.A.'s erection testimony." *Id.* at 37.

### 2. Legal Standard

A prosecutor violates her duty to disclose information when she uses testimony which she knows or should know is perjured or false. *See United States v. Agurs*, 427 U.S. 97, 103-07 (1976). When a prosecutor obtains a conviction by the use of testimony that she knows or should

_____

that he felt defendant's erection, a claim made for the first time at trial, more than a decade after the spooning incident." *Id.* at 13-15.

1    know is false or perjured, the conviction must be set aside if there is any reasonable likelihood that

2    the testimony could have affected the judgment of the jury.  *See Agurs*, 427 U.S. 97, 103.  In fact,

3    "[a] conviction obtained using knowingly perjured testimony violates due process, even if the

4    witness's perjured testimony goes only to his credibility as a witness and not to the defendant's

5    guilt." *United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011) (citing *Mooney v. Holohan*,

6    294 U.S. 103, 211 (1935)).

7        The same result obtains when the prosecutor, although not soliciting false evidence, allows

8    it to go uncorrected when it appears.  *Napue*, 360 U.S. at 269; *cf. United States v. Alli*, 344 F.3d

9    1002, 1006-08 (9th Cir. 2003) (reversal not required under plain error standard where government

10   breached its duty to correct known misstatements of its witnesses regarding possible benefits in

11   exchange for testimony favorable to the government when defense counsel had the plea

12   agreements, used them in cross-examining the witnesses, and could have introduced them; the

13   witnesses' false testimony was corrected; and the prosecutor never sought to capitalize on the false

14   testimony).[12] To prevail on a claim based on *Agurs/Napue*, the petitioner "must show 'that (1) the

15   testimony (or evidence) was actually false, (2) the prosecution knew or should have known that

16   the testimony was actually false, and (3) . . . the false testimony was material.'"  *Hayes v. Brown*,

17   399 F.3d 972, 980, 984 (9th Cir. 2005) (en banc) (quoting *United States v. Zuno-Arce*, 339 F.3d

18   886, 889 (9th Cir. 2003)); *see also Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019).

19        "Material" means that there is a reasonable likelihood that the false evidence or testimony

20   could have affected the judgment of the jury.  *Morris v. Ylst*, 447 F.3d 735, 743 (9th Cir. 2006).

21   Materiality under *Napue* requires a "lesser showing of harm . . . than under ordinary harmless

22   error review." *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013).  But, after weighing the effect

23   of alleged *Napue* violations collectively, *see Phillips v. Ornoski*, 673 F.3d 1168, 1189 (9th Cir.

---

25   [12] In cases in which the prosecutor has violated both *Napue* and *Brady*, a court must first consider
26   the *Napue* violations collectively to determine whether there is a reasonable likelihood that the
     false testimony or evidence "could" have affected the judgment.  *Phillips v. Ornoski*, 673 F.3d
     1168, 1189-1190 (9th Cir. 2012) (quoting *Sivak v. Hardison*, 658 F.3d 898, 912 (9th Cir. 2011)).
27   If the *Napue* errors are not enough to grant relief, the court must consider both the *Napue* and
     *Brady* errors and ask whether there is a reasonable probability that, but for the errors, the result of
28   the proceeding "would" have been different.  *Id.*

United States District Court
Northern District of California

2012), there still needs to be a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Hayes*, 399 F.3d at 985 (quoting *Belmontes v. Woodford*, 350 F.3d 861, 881 (9th Cir. 2003)). Thus, a *Napue* claim fails if, absent the false testimony or evidence, the petitioner still "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hayes*, 399 F.3d at 984 (quoting *Hall v. Dir. of Corr.*, 343 F.3d 976, 984 (9th Cir. 2003) (per curiam)). The *Agurs/Napue* materiality test is the same standard as the *Chapman v. California* harmless error standard. *See Chapman v. California*, 386 U.S. 18, 24 (1967) (holding that the beneficiary of constitutional error must prove "beyond a reasonable doubt" that the "error complained of did not contribute to the verdict obtained"); *see also United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985) (explaining the standard of review applicable to the "knowing use of perjured testimony" is "equivalent to the *Chapman* harmless error standard.")

If the claim meets the materiality standard under *Agurs/Napue*, then no separate analysis of harmlessness under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which asks whether the error "'had substantial and injurious effect or influence in determining the jury's verdict,'" is required. *Hayes*, 399 F.3d at 984 (holding that when the Supreme Court has declared a materiality standard for a certain kind of constitutional error there is no need to conduct a separate harmless error analysis, meaning that once a federal court has determined whether the state court reasonably determined whether *Napue* error was material under the *Agurs* standard, there is no need for a separate *Brecht* examination).

### 3.    Analysis

The state court's determination that the jury's decision on the final five counts was not attributable to R.A.'s testimony was not unreasonable under or contrary to clearly established federal law. The prosecution presented a powerful case of Weissman's guilt, with substantial evidence showing that he had committed lewd acts against the victims whose accounts serve as the basis for the remaining five counts. Each of the accusers whose testimony formed the basis for the remaining five counts testified in front of the jury. Their testimony described actions that are overtly sexual in nature.

K.C. testified that Weissman forced K.C. to orally copulate him, which served as the basis

for Counts 7 and 9.  2RT 334-337.  T.B. testified that Weissman entered his bedroom and touched

T.B.'s penis at least two times, which served as the basis for counts 12 and 13.[13] 8RT 1839-40,

1840-1843, 1844-1845, 1847, 1850-1852, 1859-1862.  And J.K. testified that on one occasion,

Weissman got into bed with him and began masturbating, which served as the basis for Count 5.

3RT 622, 624-632; 5RT 1035-1037.  J.K. also testified that he found a camera in Weissman's

bathroom that was pointed at the toilet area.  3RT 594; 5RT 1139.  R.A.'s testimony was only one

part of the entire prosecution, and it was not a crucial component with respect to the remaining

five counts.

Because the "verdict" on the remaining counts is still reasonably "worthy of confidence,"

*Phillips*, 673 F.3d at 1189, the state appellate court was not unreasonable in finding that the *Napue*

error was "harmless beyond a reasonable doubt."  State Opinion at 37; *see also Panah v. Chappell*,

935 F.3d at 664 (quoting *Hayes*, 399 F.3d at 985) (finding that because the State had presented a

powerful case of the defendant's guilt, and the flawed testimony was only one small part of that

case, the guilty verdict was still worthy of confidence).

Weissman argues that the state court's finding was an unreasonable interpretation of the

*Chapman* materiality test because the evidence of his guilt on the remaining five counts was

"equivocal and depended almost entirely, if not entirely, upon the accusers' credibility."  Petition

at 29:14-15.[14]  He contends that the testimony of the other victims, K.C., T.B., and J.K., was

"wholly uncorroborated by any physical evidence, medical testimony, percipient witness or

admission," and that each accuser had "monumental credibility problems."[15] *Id.* at 30:12-26.  But

_____

[13] While Weissman contests the credibility of the other witnesses, the jury heard them testify and deemed them credible.

[14] Weissman also argues that the state court's finding that the *Napue* error was harmless as to five counts was unreasonable because *Napue* errors trigger "virtually automatic" reversal.  Weissman cites *Hayes v. Brown* to support this assertion.  399 F.3d at 984.  But, as respondent notes, the *Hayes* court also stated that the mere fact of constitutional error does not "end [the court's] analysis," and that "*Napue* . . . [does not create] a per se rule of reversal." *Id.*

[15] Weissman cites that: (1)  K.C. only recalled the alleged molestation one night in 2007 (ten years after the alleged incident), when he took 2 tabs of LSD and shared 1/3 of a bottle of whisky with his friend, Daniel C. or "Clay," (2RT 342-348, 363-364), but, his friend (Daniel C. or Clay) recalled that K.C. said he was molested by a "neighbor" and the man's name was "Bill" (13RT 3008-14, 3022-23); (2) Weissman's name is not "Bill," and he was not K.C.'s neighbor (2RT 362-

United States District Court
Northern District of California

the jury was given the chance to hear these witnesses testify and assessed them to be credible.   In

a child molestation case, there are often no witnesses other than the victim and the accused.  And

the witnesses' testimony was not wholly uncorroborated: J.K. told his mother that Weissman had

gotten into bed with him and started masturbating, *see* 3RT 641, 643-645; 5RT 1121-1123, 1137,

and Weissman himself admitted to his friend, Sybille Peters, that he was "jacking off" while J.K.

was in bed with him.  16RT 3838.

Weissman also argues that the state appellate court should have employed the materiality

test established by the Supreme Court in *Brady v. Maryland*, and that the false testimony at issue

would have met that materiality test.  *See Brady v. Maryland*, 373 U.S. 83 (1963).  This argument

is unpersuasive.  The *Brady* test places a higher burden on the defendant than the *Brecht* test, so

Weissman argues that had the state court have understood him to have met the *Brady* test, the

*Brecht* test would have become redundant.  Petition at 29:22-27; *see also Kyles v. Whitley,* 514

U.S. 419, 435-36 (1995) (holding that the *Brady* test which requires "reasonable probability" of a

"different result" is a higher bar for the defendant to meet than the *Brecht* test).  The Supreme

Court has held that "[w]hen the 'reliability of a given witness may well be determinative of guilt

or innocence,' nondisclosure of evidence affecting credibility" falls within the rule established by

*Brady v. Maryland*.  *Giglio v. United States*, 405 U.S. 150, 154 (1972).

Here, Weissman's attempt to invoke the *Brady* standard fails because, as discussed above,

the state court reasonably determined that R.A.'s reliability or lack thereof was not determinative

of Weissman's guilt or innocence on the remaining five claims.[16]

---

364); and (3) K.C. also admitted that when he reported the incident to the police after reading
about Petitioner's arrest, he failed to tell the police about the LSD, and only told the police about
LSD after his friend had revealed it to the police.  (2RT 362- 364).

[16] In his traverse, Weissman conflates issues.  He argues that since respondent cites no caselaw
where *Napue* error was found to be harmless upon federal habeas review where the false statement
was "important evidence" and/or "very strong evidence" that the petitioner had criminal intent
(sexual or otherwise), respondent has failed to show that the state court's finding was reasonable.
Petitioner's Traverse ("Traverse") [Dkt. No. 10] at 10:9-14.  I interpret this argument as merely
bolstering the state court's decision to reverse nine counts against Weissman where the false
testimony *did* serve as important or strong evidence against him.  In the five counts that remain,
the state court found that the false statement was not very strong evidence of his criminal intent
because other evidence—namely, testimony by other accusers that the jury found credible—
established that intent.  Weissman's case is distinguished in that way from two cases he cites in

1        Next, Weissman contends that courts frequently find that a prosecutor's emphasis of an

2   error in closing argument demonstrates prejudice under *Brecht*.  Petition at 32:7-10.  That rule is

3   not absolute enough to make the state court's finding unreasonable.  In one of the cases Weissman

4   relies upon, *Aguilar v. Woodford*, where the Ninth Circuit reviewed a federal court's denial of

5   habeas in a homicide case, the prosecutor emphasized the unreliable scent identification of a

6   police dog whom the prosecutor knew to have been flagged for past misidentifications.  *See*

7   *Aguilar v. Woodford*, 725 F.3d 970 (9th Cir. 2013).  That was a *Brady* error.  Eyewitness accounts

8   were hazy, none of the witnesses personally knew the defendant, and none was sure of their

9   identification, so the police dog's scent-identification linking the defendant to the crime was

10  crucial to the prosecution's case.  *Id.* at 978, 984.  Absent the dog scent testimony, there was "no

11  corroborating evidence for the shaky eyewitness identifications."  *Id.* at 984.

12       In *Aguilar*, the Ninth Circuit rejected the State's argument that the scent-identification

13  evidence was not probative in part because the prosecutor relied upon it so heavily in the closing

14  argument.  *Id.* at 985.  But in this case, unlike in *Aguilar*, R.A.'s testimony was not crucial to the

15  prosecutor's closing argument.  R.A.'s testimony was just one story among many, similar stories

16  from several boys, all of whose credibility the jury was able to judge.

17       Weissman finally argues that the prosecutor's closing argument, urging the jury (consistent

18  with the trial court's instructions) that conviction on any count was part of the "repetition" or

19  "pattern" that could be used to prove guilt of other counts, was prejudicial considering the *Napue*

20  error that had polluted some counts, and that the state court was unreasonable in finding otherwise.

21  Petition at 32:15-33:13.  He contends that because the prosecutor told the jury that conviction on

22  one count could be pattern evidence of guilt on other counts, he made it impossible for the jury to

23  *not* consider R.A.'s false testimony while considering Weissman's guilt on all counts.

24       The facts of Weissman's case differ significantly from those where erroneous arguments

---

26  support of this argument, *United States v. Wallace*, 848 F.3d 1464 (9th Cir. 1988) and *United
27  States v. Weatherspoon*, 410 F.3d 1142 (9th Cir. 2005), two Ninth Circuit cases where the State's
    case was notably weaker, *Napue* error was not at issue, and the court did not use the AEDPA
28  deferential standard of review.

United States District Court
Northern District of California

were found to be prejudicial because they were repeated to the jury throughout trial.  For example, Weissman relies on *United States v. Combs*, where the Ninth Circuit reviewed a conviction for manufacturing methamphetamine on direct appeal.  379 F.3d 564 (9th Cir. 2004).  Only two pieces of evidence tied defendant to the crime in question: (1) the testimony of a cellmate, who had been offered possible leniency in exchange for testifying against Combs, and (2) the testimony of a federal agent.  *Id.* at 573.  There was no direct evidence of guilt, and the "circumstantial evidence was not overwhelming." *Id.*

During cross-examination, the prosecutor improperly compelled the defendant to "impugn the veracity" of the federal agent who testified against him, which "pitt[ed] [the defendant's] credibility against [the federal agent's]." *Id.* at 573.  The prosecutor "revived the error" by "reemphasizing [the prejudicial testimony]" in closing argument, "immediately before the jury entered deliberations." *Id.*  In so doing, "the prosecutor herself destroyed any chance that the jury forgot about the error or viewed it as an unimportant, isolated incident." *Id.* at 574.  And the trial judge "twice chastised Combs on the stand and instructed him to answer the prosecution's question about the truthfulness of [the agent's] testimony," which essentially amounted to the court endorsing the prejudicial testimony. *Id.* at 574-75.  The agent's testimony was one of only two pieces of evidence against the defendant, and it was corrupted by the prosecutor.  This led the Ninth Circuit to conclude that the error required reversal.

In contrast, R.A.'s testimony about Weissman having an erection while spooning him was not the focus of the prosecutor's closing argument.  The erroneous testimony did not play a large role in the case against Weissman overall.  And the error was not endorsed by the court.  The testimony of the victim witnesses was strong and credible proof to support the five counts.[17] Weissman is not entitled to federal habeas relief for *Napue* error under the deferential AEDPA

---

[17] Weissman also misconstrues an instruction the trial court gave regarding *uncharged* crimes to argue that the jury was instructed that it could use the finding of guilt as to one accuser (such as R.A.) to show that Weissman had a plan to molest children and harbored sexual intent.  It was clear, however, that for the *charged* offenses, each was separate and had to be proven and considered independently.  As the state court points out, the trial court's instruction about which Weissman complained only applied to "evidence that the defendant committed other offenses that were *not* charged in this case." 19RT 4543-4544.

1    standard because the state court's decision was not unreasonable or contrary to federal law.

2            **B.      Improper Contact with Excused Juror**

3                    **1.      Background**

4            After the close of evidence but before closing arguments, Juror No. 1 was excused for the

5    purpose of attending a medical school interview.  State Opinion at 22.  After she was excused, the

6    prosecutor asked for her phone number because "he wanted to talk to [her] about the case" and

7    would call her later to hear her "impressions of the trial." *Id.* at 22-23.  That evening, the

8    prosecutor called Juror No. 1 and they spoke for "[l]ess than an hour." *Id.*  The prosecutor asked

9    her about "each of the witnesses that testified at the trial" and whether she "thought each witness

10   was credible or not." *Id.*  Juror No. 1 "answered his questions and provided him with the

11   information he requested." *Id.* at 23.

12           One of the witnesses the prosecutor asked about was Leslie Karst.  During Karst's

13   testimony, a different juror—not Juror No. 1—had sent a note that raised questions about whether

14   Karst's wife had been in court earlier and perhaps communicated to Karst what prior witnesses

15   had said.  2CT 490; 23RT 5849-5851.  The prosecutor had addressed this by cross-examining

16   Karst about the question from the note; Karst admitted that her wife was Weissman's friend and

17   had been taking notes on the trial and bringing those notes home with her.  Karst denied seeing the

18   notes or discussing them with her wife.  15RT 3587-3595.  When Juror No. 1 spoke with the

19   prosecutor after being excused, she said that she was "a little suspicious" of Karst's testimony

20   because "it seemed like she had some prior knowledge of what had gone on in the courtroom."

21   State Opinion at 23.

22           During closing argument, the prosecutor said that "one juror noted right away that Ms.

23   Karst . . . has her own bias, motives, and agendas coming in here." He further stated, "[y]ou want

24   to talk about someone that had some honesty issues, that's a lady that was a little hard to believe."

25   *Id.*

26           Weissman's counsel thought that the prosecutor's statements were motivated by his

27   improper contact with Juror No. 1.  That contact was the topic of an evidentiary hearing the trial

28   court held more than one year after the trial ended.  *Id.* at 24.  Both the prosecutor and Juror No. 1

United States District Court
Northern District of California

20

1    testified.  The prosecutor explained that the statements concerning Karst referred to the note that

2    came from the other juror during trial, not from his conversation with Juror No. 1.  He testified

3    that Juror No. 1's comments were "useful in the sense that she liked the case" and that she did not

4    have any problems with the witnesses.  *Id*.  The prosecutor did not reopen the case to introduce

5    additional evidence and testified that his closing argument was "mostly written" by the time he

6    spoke to her.  23RT 5625-5626.

7         Juror No. 1 testified that she spoke to the prosecutor for less than an hour about her

8    "general opinions" or "general thoughts" about the witnesses, including whether she thought they

9    were credible.  *See* 24RT 5758-5760, 5779.  She did not remember speaking about Karst during

10   the phone call but did testify that she thought Karst might have been "a little bit biased."  24RT

11   5761-5762.

12        After the evidentiary hearing, the trial court ruled that it was "undisputed" that the contact

13   with Juror No. 1 should not have occurred and was a violation of the Rules of Professional

14   Conduct.  Petition Ex. A at 24-25 (citing Cal. Rules of Prof. Conduct 3.5(e), (1)).  But the trial

15   judge determined that the conduct did not merit a new trial for two reasons.  First, Juror No. 1 had

16   no contact with any sitting jurors after her contact with the prosecutor and had no discussions

17   about her concerns during the trial.  Second, there was no evidence that the prosecutor changed

18   tactics or strategy based on the contact.  The jury had been instructed that they should base their

19   decision only upon the evidence and the court's instructions on the law, and the court assumed that

20   they followed those instructions.

21        The state appellate court affirmed.  It agreed that the prosecutor's conduct was improper

22   but found that the State had rebutted the presumption of prejudice in the evidentiary hearing.  State

23   Opinion at 25-27.   It evaluated Weissman's claims pursuant to the clearly established law for

24   evaluating a juror's contact with an outside party—*Mattox v. United States*, 146 U.S. 140 (1892)

25   and *Remmer v. United State*, 347 U.S. 227 (1954)—acknowledging that the cases are not exactly

26   on point because they both concerned sitting jurors rather than excused jurors. [18]

27   ───────────────

28   [18] As a preliminary matter, respondent contends that "no clearly established Supreme Court law
     supports [claim two]."  Answer at 40.  That is arguable, and I do not reach it because I agree with

United States District Court
Northern District of California

On appeal to the state court, Weissman argued that the prosecutor's improper conduct was structural error that was per se reversible.  The court rejected this argument, stating that "[Weissman's] reliance on *Hobson v. Wilson* (D.C. Dir. 1984) 737 F.2d 1 is puzzling[,]" because in *Hobson*, a civil case, "an excused juror was contacted by one of the plaintiffs' attorneys between the close of evidence . . . provided the attorney with her opinions about the evidence . . . [but] the *Hobson* court did not find the error to be structural or to merit per se reversal."  State Opinion at 25-26.  The court explained that *Hobson* relied on *Mattox* and *Remmer*, two cases that both involved improper contact between a prosecutor and a sitting juror, not an excused juror, during a trial, and neither of which concluded that the error was structural or merited reversal.  *Id.* And in both *Mattox* and *Remmer*, the Supreme Court applied a rebuttable presumption of prejudice.[19]

### 2.  Legal Standard

"[P]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."  *Mattox*, 146 U.S. at 142.  *Mattox*'s "presumption is not conclusive, but the burden rests heavily on the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Remmer*, 347 U.S. at 229.

---

respondent on other grounds.  Courts in this circuit have cited *Mattox* and *Remmer* on this issue of improper contact between a juror and witness or interested party.  *See e.g. Caliendo v. Warden*, 365 F.3d 691, 695 (9th Cir. 2004) (holding that "*Mattox* established a bright-line rule: Any unauthorized communication between a juror and a witness or interested party is presumptively prejudicial, but the government may overcome the presumption by making a strong contrary showing.")  And the Ninth Circuit held in *Von Tobel v. Benedetti* that the *Mattox* and *Remmer*-derived test is clearly established federal law.  975 F.3d 849, 853 (9th Cir. 2020).  While *Mattox* and *Remmer* do not specifically concern an excused juror, they also do not merely establish a "general proposition" which would be insufficient to clearly establish a specific question presented by the case.  *See Lopez v. Smith*, 574 U.S. 1, 5-7 (2014) (per curiam) (where the Supreme Court repeated a warning it issued previously to lower courts against "framing [Supreme Court] precedents at such a high level of generality").

[19] Defendant also argued on appeal that the standard for reversal should turn on whether the contact was "trivial," but the state appellate court found that the authority he cited established that the standard is whether the presumption of prejudice has been rebutted.

United States District Court
Northern District of California

1    In *Godoy v. Spearman*, the Ninth Circuit clarified that the test derived from *Mattox* and

2  *Remmer* constitutes clearly established federal law for evaluating a juror's contact with an outside

3  party.  *See Godoy v. Spearman*, 861 F.3d 956, 968 (9th Cir. 2017); *see also Von Tobel v.*

4  *Benedetti*, 975 F.3d 849, 853 (9th Cir. 2020) (explaining that a test derived from *Mattox* and

5  *Remmer* constitutes clearly established federal law for evaluating a juror's contact with an outside

6  party).  The court in *Godoy* held that "[h]armlessness in this context means 'that there is no

7  reasonable possibility that the communication . . . influenced the verdict.").  *Godoy*, 861 F.3d at

8  968.

9    When faced with allegations of improper contact between a juror and an outside party,

10  courts apply a settled two-step framework.  *Id.* at 967-68.  At step one, the court asks, "whether

11  the contact was 'possibly prejudicial,' meaning it had a 'tendency' to be 'injurious to the

12  defendant.'" *Id.* (quoting *Mattox*, 146 U.S. at 150).  If so, "the contact is 'deemed presumptively

13  prejudicial' and the court proceeds to step two, where the 'burden rests heavily upon the [state] to

14  establish' the contact was, in fact, 'harmless.'" *Id.* (quoting *Remmer*, 347 U.S. at 229).  "If the

15  state does not show harmlessness, the court must grant the defendant a new trial." *Id.* (citation

16  omitted).  "When the presumption arises but the prejudicial effect of the contact is unclear from

17  the existing record, the trial court must hold a 'hearing' to 'determine the circumstances [of the

18  contact], the impact thereof upon the juror, and whether or not it was prejudicial.'" *Id.* (quoting

19  *Remmer*, 347 U.S. at 229-30).

20    **3.  Analysis**

21    The state appellate court correctly determined that the prosecutor's contact with the juror

22  was harmless.  No case authority supported Weissman's structural error argument and "nothing in

23  the record support[ed] his claim that the prosecutor's improper conduct had any impact on his

24  right to an impartial jury." State Opinion at 26.  This was a reasonable finding under *Mattox* and

25  *Remmer* as understood by *Godoy*, for three reasons.

26    First, Juror No. 1 did not deliberate in Weissman's conviction.  It was undisputed that she

27  had not discussed the case with her fellow jurors either while she was a juror or after she was

28  excused but before there was a verdict.  She had no contact with the trial jurors between her

United States District Court
Northern District of California

1    excusal and the verdicts.  State Opinion at 26-27; 24RT 5768, 5772-5773.

2          Second, the sole opportunity that the prosecutor had to act on the information he received

3    from Juror No. 1 was in his closing arguments.  The prosecutor did not change his arguments to

4    accommodate any new information he learned from her.  State Opinion at 27.  He testified at the

5    evidentiary hearing that she merely boosted his confidence in the case rather than provided him

6    with any information that he used to craft or change his closing arguments.  *Id*.

7          Finally, Karst, whose testimony is at issue in this claim, was a "very weak defense witness

8    testifying about largely tangential issues."  *Id*.  Her credibility was unimportant because of that,

9    and the state could rebut the presumption of prejudice even if the prosecutor's closing argument

10   was influenced by Juror No. 1.  All of this showed that the prosecutor's contact with the excused

11   juror did not tend to injure Weissman.

12         The trial court credited the prosecutor's testimony that his closing argument was based on

13   another juror's question rather than the excused juror's comments.  The state appellate court found

14   this testimony credible because it was "completely consistent with the record."  State Opinion at

15   25-27.

16         The other juror's note raised concerns about whether Karst's wife was in court, whether

17   Karst's wife had heard other witnesses' testimony, and whether Karst's wife knew other people in

18   court.  *Id.*; 2CT 490; 23RT 5849-51.  Weissman points out that these concerns did not

19   "specifically address 'bias', 'motive', or 'agenda'," yet those were the three topics addressed in

20   the prosecutor's closing argument.  He argues that because the excused juror told the prosecutor

21   that she believed "[K]arst had her own bias or agenda," the state appellate court unreasonably

22   found that the presumption of prejudice had been rebutted.  Traverse at 22:18-25.  But the juror

23   question that was submitted to the court during trial did concern issues that related to bias and

24   agenda.  The state court was not unreasonable under the *Mattox* and *Remmer* standard or acting

25   contrary to clearly established federal law in determining that the prosecutor's comments on Karst

26   in closing were derived from the juror note rather than from his conversation with Juror No.1.

27         The state appellate court determined that the state had rebutted the presumption of

28   prejudice that arose when the prosecutor contacted Juror No. 1.  *Id.*  While there is no clear

1    standard for prejudice in this context, the Ninth Circuit has evaluated improper contact with a

2    *sitting* juror under a harmlessness standard, i.e. whether there was any "reasonable possibility that

3    the communication . . . influence[d] the verdict." *Godoy*, 861 F.3d at 968.  Under that standard, the

4    state appellate court's conclusion that the prosecutor's error could not have impacted the

5    petitioner's right to an impartial jury was reasonable under and not contrary to clearly established

6    federal law. [20]  Juror No. 1 did not deliberate or have any contact with sitting jurors, her

7    conversation with the prosecutor did not affect his closing argument in any significant way, and

8    Karst was a weak defense witness "testifying about tangential issues."  *See* State Opinion at 27.

9    The state court's decision regarding prosecutorial misconduct related to improper contact with

10   Juror No. 1 is entitled to AEDPA deference; Weissman is not entitled to federal habeas relief.

           **C.    Failure to Disclose T.B. Gifts**

11

12                 **1.    Background**

13                 The prosecutor learned after trial that a witness advocate had given T.B. an old laptop and

14   a $50 gift card after T.B. finished testifying.  State Opinion at 37-38.  When and in what context

15   T.B. learned that he would be receiving a laptop is disputed.  At the evidentiary hearing, the

16   prosecutor testified that he knew nothing about the laptop given to T.B. prior to T.B. testifying.

17   *Id.*  Respondent contends that T.B. did not receive the laptop until after he testified.  Weissman

18   claims that T.B.'s testimony at the evidentiary hearing suggests that he knew he was going to

19   receive the laptop the day that he testified.  Petition at 59:18-62:18; Dkt. No. 9-5 at 5573.  The $50

20   gift card was given to him after he finished testifying.  State Opinion at 38.

21                 Weissman argues that the prosecutor's failure to disclose to the defense the gifts that T.B.

22   received violated the prosecution's obligation under *Brady v. Maryland*, 373 U.S. 83, 87 (1963),

23   to disclose material favorable to the defense.  *Id.*  The state appellate court considered Weissman's

24

---

25   [20] Finally, Weissman claims that the prosecutor changed his closing argument after speaking to
     Juror No. 1 to focus on whether Weissman lacked "heterosexual" relationships or otherwise lied

26   about being "heterosexual." Petition at 39:10-22.  It does not appear that the state appellate court
     addressed this issue. *See generally* State Opinion.  I review it de novo.  Weissman points to no

27   evidence that would suggest that the prosecutor changed his closing argument to focus on whether
     Weissman misrepresented himself as a "heterosexual" based on the conversation he had with Juror
     No. 1.  And the state court correctly ruled on that issue, as I discuss later.

28

*Brady* claim in terms of whether the undisclosed evidence would have affected the impact of the other impeachment evidence.  *See* State Opinion at 38-39.  It employed a *Brady* standard as interpreted by *Kyles v. Whitley*, where the Supreme Court held that "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (citing *Kyles*, 514 U.S. at 433).  And the California Supreme Court has noted that evidence is not material if "it would have added little to the cumulative impact of the other impeachment evidence." *People v. Dickey*, 35 Cal. 4th 884, 909 (2005).

The state appellate court ruled that "[Weissman] has failed to persuade us that evidence that T.B. was given an old laptop and a $50 gift card after he finished testifying would have added anything to the 'cumulative impact of the other impeachment evidence.'" State Opinion at 39.  It explained that T.B. was already impeached with the following: evidence that he had initially repeatedly denied that Weissman molested him; "considerable" evidence that he had a history of mental health issues, including hallucinations; his admission that he had previously suggested that his mother had sexually molested him when she had not; and his admission at trial that he had a "history of lying." *Id.*

In response to Weissman's argument that the gift evidence would have provided a selfish motive for T.B. to testify, the court was unpersuaded.  *Id.* at 40.  The court explained that because T.B.'s testimony was consistent with statements that he made before he was offered or received any gifts, the motivation Weissman alleged was not evidenced.  *Id.*  It stated, "[Weissman] does not explain how gifts that had never been mentioned to T.B. previously and were given to T.B. on the day of his trial testimony could have influenced his trial testimony, which was entirely consistent with his prior statements detailing defendant's molestation of him." *Id.*  For these reasons, the court rejected Weissman's contention that the prosecutor's failure to disclose the gifts to T.B. until after trial constituted a *Brady* violation.

### 2.   Legal standard

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of

1    evidence favorable to an accused upon request violates due process where the evidence is material

2    either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373

3    U.S. 83, 87 (1963).  Evidence is material if "there is a reasonable probability that, had the

4    evidence been disclosed to the defense, the result of the proceeding would have been different."

5    *Cone v. Bell*, 556 U.S. 449, 469-70 (2009).  The Court has since made clear that the duty to

6    disclose such evidence applies even when there has been no request by the accused, *see United*

7    *States v. Agurs*, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as

8    well as exculpatory evidence, *see United States v. Bagley*, 473 U.S. 667, 676 (1985).

9        "[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there

10    is a reasonable probability that the suppressed evidence would have produced a different [result]."

11    *Strickler v. Greene*, 527 U.S. 263, 281 (1999).  "A reasonable probability does not mean that the

12    defendant 'would more likely than not have received a different verdict with the evidence,' only

13    that the likelihood of a different result is great enough to 'undermine confidence in the outcome of

14    the trial.'"  *Smith v. Cain*, 565 U.S. 73, 74 (2012) (quoting *Kyles*, 514 U.S. at 434).  "[E]vidence

15    impeaching an eyewitness may not be material if the State's other evidence is strong enough to

16    sustain confidence in the verdict."  *Smith*, 565 U.S. at 76-77 (finding impeachment evidence of

17    prosecution's sole witness material); *accord Agurs*, 427 U.S. at 112-13 & n.21.

18        In sum, for a *Brady* claim to succeed, (1) the evidence at issue must be favorable to the

19    accused, either because it is exculpatory or impeaching; (2) that evidence must have been

20    suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice must have

21    ensued.  *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler*, 527 U.S. at 281-82; *cf. Towery v.*

22    *Schriro*, 641 F.3d 300, 309-10 (9th Cir. 2010) (no habeas relief on *Brady* claim under § 2254

23    where state court reasonably determined "beyond a reasonable doubt that the prosecutor's

24    misconduct did not affect the verdict").  In determining whether the suppression of impeachment

25    evidence is sufficiently prejudicial to rise to the level of a *Brady* violation, the court analyzes the

26    totality of the undisclosed evidence "in the context of the entire record." *Agurs*, 427 U.S. at 112;

27    *see also Bagley*, 473 U.S. at 682 (opinion of Blackmun, J.)  The materiality inquiry subsumes any

28    harmless error analysis: if error is found, "it cannot subsequently be found harmless

United States District Court
Northern District of California

27

1    under *Brecht*."  *Kyles*, 514 U.S. at 435.

2              **3.    Analysis**

3              While the tests the state appellate court employed do not exactly mirror the Supreme

4    Court's language describing what would constitute a *Brady* violation, they were not an

5    unreasonable interpretation of or contrary to the rules governing materiality set forth by the

6    Supreme Court in *Strickler v. Green* and *Kyles v. Whitley*.  *See supra* C(1).

7              Weissman's argument rests partially on *Benn v. Lambert*, where the Ninth Circuit affirmed

8    a district court's grant of habeas relief, holding that "the state cannot satisfy its *Brady* obligation to

9    disclose exculpatory and impeachment evidence 'by making some evidence available and

10   asserting that the rest would be cumulative.'" Petition at 60:23-61:7; *Benn v. Lambert*, 283 F.3d

11   1040, 1058 (9th Cir. 2002).   Instead, "the state is obligated to disclose 'all *material* information

12   casting a shadow on a government witness's credibility[,]'" including that the witness might have

13   had some reason "other than altruism" for testifying for the state. *Benn*, 283 F.3d 1040, 1058

14   (interpreting *Agurs*, 427 U.S. at 112, and *Bagley*, 473 U.S. at 682) (emphasis added).

15             In *Benn*, a jail-house informant (the "informant-witness") who shared a cell with the

16   defendant when the defendant was awaiting trial for homicide testified on behalf of the

17   prosecution.  The prosecution's case relied heavily on "various inculpatory statements" that

18   defendant had made to the informant-witness.  *Id.* at 1045.  The defense tried to undermine the

19   informant-witness's credibility by establishing that he was receiving a slightly reduced sentence

20   for testifying.  *Id.* at 1058.  The defense also attempted to impeach him by eliciting testimony that

21   he was being paid for his testimony, and that the State was paying for his hotel room and food

22   during trial.  *Id.* at 1047.  What the defense did not know was that the prosecution failed to

23   disclose "multiple pieces of critical impeachment information that could have been used to

24   undermine the credibility of [the informant], a prosecution witness whose testimony was crucial to

25   the state's claims[.]" *Id.* at 1054.  This included: (1) repeated unlawful acts by the informant-

26   witness when he was acting as an informant;[21] (2) that at one point during the defendant's trial the

27   _____

28   [21] The state failed to disclose evidence of the jail-house informant's "persistent misconduct while
     acting as an informant," despite the trial judge's explicit requests that they do so.  *Id*.  This

United States District Court
Northern District of California

prosecutor arranged for the informant-witness to be released without charge for an unrelated arrest; (3) that the prosecutor's office declined to charge the informant-witness with burglary during the *Benn* trial, and arranged to postpone the filing of a warrant against him; and (4) that the informant-witness approached the police a week before the *Benn* trial claiming he had a videotape showing that the defendant was involved in an unrelated, notorious unsolved murder case, that he was given $150 to produce the tape, that he never did, and that the detectives concluded that the informant-witness was lying about both the tape's existence and the defendant's involvement in the other murders. *Id.* at 1057.

Benn was convicted. On appeal, the state argued that the evidence that the prosecutor concealed was cumulative and not material because the jury knew that the informant was getting a reduced sentence, which constituted disclosure of benefits that would have independently allowed the jury to decide whether the informant had a motive other than altruism for testifying for the state. *Id.* The state also contended that the informant-witness was sufficiently impeached by "questions about his history as a paid informant in drug cases, his prior convictions, the reduction in his arson sentence, and the fact that the state was paying his motel and food bills." *Id.* The Ninth Circuit rejected those positions. It held that "the number and nature of the undisclosed benefits was such that they would have impeached [the informant-witness] more effectively than the evidence that he was immune from arrest during the trial." *Id.* at 1058. The suppressed evidence, the court found, would have "cast a shadow" on the informant-witness's credibility, and thus, their suppression was material.

The fundamental difference between *Benn* and this case is that in *Benn*, the multiple failures to disclose were material. Here, the state court identified all the other impeachment evidence that Weissman could—and did—use to contest T.B.'s accusations against Weissman. *See supra* C.1. It was not unreasonable to determine that the undisclosed impeachment evidence

---

misconduct included: stealing drugs and money during drug busts and lying about it; that a detective had written a deactivation memo about the informant stating that he could no longer work as an informant because he could not be trusted to follow departmental rules; that he had obstruction of justice charges being filed against him; that he had smuggled guns into a prison where he was housed; and that he had perjured himself at trial. *Id.*

United States District Court
Northern District of California

1   was far less damaging to T.B.'s credibility than the impeachment evidence that defense counsel

2   used at trial; its suppression did not constitute a *Brady* violation.

3        The undisclosed benefits for T.B. are not of the same nature or scale as those concealed in

4   *Benn* or other similar cases.[22] *See also e.g. Singh v. Prunty*, 142 F.3d 1157 (9th Cir. 1998)

5   (petitioner entitled to federal habeas relief from murder conviction where an evidentiary hearing

6   revealed that the prosecution's main witness had entered into an agreement to receive benefits in

7   the form of expunged criminal charges in exchange for his testimony against petitioner and that he

8   had probably lied about not using heroin prior to his trial testimony, yet the state appellate court

9   had unreasonably determined that the state's nondisclosure of this agreement did not violate

10  petitioner's constitutional rights even though only circumstantial evidence tied petitioner to

11  crime).  And the state appellate court here found that Weissman had not explained how the gifts

12  could have affected T.B.'s trial testimony since it was consistent with T.B.'s prior statements

13  about Weissman's molestation.  State Opinion at 39-40.  For this reason, the court rejected his

14  contention that the gift evidence provided T.B. with a selfish motive to testify.  T.B.'s credibility

15  as a witness was for the jury to decide, and it decided he was credible.

16       This was not an unreasonable application of clearly established federal law.  The state

17  court's decision is entitled to AEDPA deference, and the petition is denied on this claim.

18      **D.**   **Prosecutorial Vouching**

19         **1.**   **Background**

20       Weissman's prosecutorial vouching and corresponding ineffective assistance of counsel

21  claims are based on several comments made by the prosecutor in his rebuttal closing argument.

22  Weissman's counsel had argued that the victims "changed their story" "after interviews with [the

23  prosecutor]." State Opinion at 29.  He told the jury that "[y]ou'll never know what happened

24  during those interviews . . . [the prosecutor] plants a word, with a suggestion."  *Id.*  He implied

25  that the prosecutor was using improper questioning methods "when he is alone and there is no

26  tape." *Id.* at 30.  He declared that J.K.'s testimony about the camera and pajama incidents was

27

28     [22] It is worth acknowledging that the prosecutor was unaware of the victim advocate's provision of
the gift card and refurbished laptop until after trial.

suspect because he first revealed these incidents to the prosecutor in an unrecorded interview. *Id.* He contended that R.A.'s testimony about the erection was suspect because R.A. had "changed" his "story" after a "private" interview with the prosecutor. *Id.* He asserted that the prosecutor, at trial, "introduce[d] the term 'sensual'," to S. and led S. to "repeat[] it back one time." *Id.* He "accused the prosecutor of manipulating the witnesses' memories during the unrecorded conversations." Answer at 52 (citing 19RT 4689 (J.K.); 19RT 4700 (Charlie); 20RT 4754, 4757 (T.B.); 20RT 4759-4761 (R.A.); 20RT 4762, 4765-4766 (S.); 20RT 4763-4771 (witnesses generally)). And finally, he suggested that prosecutor was playing mind games with the jury, making statements like "[the prosecutor] played the same technique on you," and "[y]ou were being trained," in reference to the prosecutor's questioning method. Answer at 53; 20RT 4767-4769 (specifically, counsel stated that the prosecutor's questioning method was "like . . . training little white rats in a Skinner box. You push the little lever and get the pellet. Mr. Moore got the information.") *Id.*

> The prosecutor responded to the attack:
>> "And today, apparently, evil me with my devil horns is coming in here and playing with my lab rats—which I apologize if anyone got that impression. That wasn't really what I was doing in the slightest." . . . "The claims of influence on T.[B.], again, [defense counsel] is asking you to speculate about a witness that didn't show, that you have no evidence about any conversation, and from that you are supposed to infer something. [¶] Here is all I do know: whatever influence that was claimed, T.[B.] denied. There was no changing or controlling of his mind. He didn't become a lab rat that got manipulated . . . I wasn't in his mind. No one was pressuring him."

State Opinion at 30.

> Concerning S.'s testimony, the prosecutor argued:
>> "I know he wants to blame me for the word 'sensual touch.' I am the one that, again, controlled his mind and controlled your mind, and I'm going to take over the universe with my evil powers."

*Id.* at 30-31.

> Weissman claims that the prosecutor's statements constitute vouching because the prosecutor "[told] the jury about his own role in the unrecorded interviews, essentially testifying without cross-examination in his closing argument," and told the jury that he had done nothing wrong. Petition at 55.

> The state appellate court evaluated this claim pursuant to *People v. Linton*, 56 Cal. 4th

1   1146, 1207 (2013).  State Opinion at 30-31.   The California Supreme Court in *Linton* held that

2   impermissible vouching occurs when prosecutors attempt bolster their case "'by invoking their

3   personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in

4   support of it,'" and that it is misconduct for a prosecutor to suggest that evidence that is available

5   to the government, but that is not before the jury, corroborates the testimony of a witness. State

6   Opinion at 31-32.

7        The court determined that Weissman's "vouching" argument was based on a "strained and

8   implausible reading of the prosecutor's remarks," and found no vouching "whatsoever." *Id.*  It

9   found that the most reasonable interpretation of the prosecutor's comments is that he was referring

10  to his direct examination of witnesses at trial, not to anything that had occurred at an unrecorded,

11  pretrial interview that would imply that the prosecutor had some "extra-record knowledge" of

12  witnesses' truthfulness.  *Id.*; *see also United States v. Necoechea*, 986 F.2d 1273, 1278 (9th Cir.

13  1993), as amended on denial of reh'g (Apr. 15, 1993).

14              **2.    Legal standard**

15        It is well settled that a prosecutor cannot act as both counsel and witness against a

16  defendant.  *United States v. Edwards*, 154 F.3d 915, 918-924 (9th Cir. 1998); *see also Kalina v.*

17  *Fletcher*, 522 U.S. 118, 130 (1997).  When such conduct occurs, it can be the basis for voiding a

18  conviction.  *Id.*  Improper vouching for the credibility of a witness occurs when the prosecutor

19  places the prestige of the government behind the witness or suggests that information not

20  presented to the jury supports the witness's testimony.  *United States v. Young*, 470 U.S. 1, 7 n.3,

21  11-12 (1985); *see also United States v. Parker*, 241 F.3d 1114, 1119-20 (9th Cir. 2001).

22  "Prosecutors sometimes breach their duty to refrain from overzealous conduct by commenting on

23  the defendant's guilt and offering unsolicited personal views on the evidence."  *Young*, 470 U.S.

24  7-8. To warrant habeas relief, prosecutorial vouching must so infect the trial with unfairness as to

25  make the resulting conviction a denial of due process.  *Darden v. Wainwright*, 477 U.S. 168, 181

26  (1986).

27        A prosecutor's comments must be evaluated in light of the defense argument that preceded

28  it. *Id.*  In order to make an appropriate assessment, "the reviewing court must not only weigh the

United States District Court
Northern District of California

1    impact of the prosecutor's remarks, but must also take into account defense counsel's opening

2    salvo." *Young*, 12-13.  The Supreme Court has explained that if "the prosecutor's remarks were

3    'invited,' and did no more than respond substantially in order to 'right the scale,' such comments

4    would not warrant reversing a conviction." *Id.* at 13.

5        There is no bright-line rule about when vouching will result in reversal.  Courts "consider a

6    number of factors including: the form of vouching; how much the vouching implies that the

7    prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any

8    inference that the court is monitoring the witness's veracity; the degree of personal opinion

9    asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the

10   specificity and timing of a curative instruction; the importance of the witness's testimony and the

11   vouching to the case overall."  *Necoechea*, 986 F.2d at 1278.

12                **3.    Analysis**

13       I agree with the state court's analysis that what the prosecutor said did not constitute

14   vouching at all, and it was certainly not vouching to such a degree that it infected the trial with

15   unfairness.  The prosecutor's comments did not "invoke[e] [his] personal prestige, reputation, or

16   depth of experience, or the prestige or reputation of [his] office," in support of his case.  Instead,

17   they responded to the defense counsel's accusations that he was manipulating witnesses and

18   jurors.  The closest the prosecutor came to improperly vouching for his witnesses was the

19   statement, "I wasn't in his mind. No one was pressuring him[,]" in reference to T.B.  State

20   Opinion at 30.   In light of the preceding defense argument, the prosecutor's comments were

21   understandable; they did not infect the trial to such a degree as to make the conviction a denial of

22   due process.  Weissman is not entitled to federal habeas relief under a prosecutorial vouching

23   theory.[23]

24

25   _____

26   [23] Because the state appellate court concluded that the prosecutor did not engage in improper
     vouching whatsoever, it did not address Weissman's ineffective assistance of counsel argument.
27   Trial counsel cannot be ineffective for failing to raise a meritless objection.  *Juan H. v. Allen*, 408
     F.3d 1262, 1273 (9th Cir. 2005).  Because the prosecutor did not engage in improper vouching as
28   it is understood by the federal courts, Weissman's defense counsel was not prejudicially deficient
     in failing to object.

United States District Court
Northern District of California

## II.    INEFFECTIVE ASSISTANCE OF COUNSEL

### A.  Failure to Object to Improper Reference to Sexual Orientation

#### 1.    Background

At trial, Weissman's defense counsel argued that there was nothing wrong with children being in bed with their parents, and that in some poor families, everyone sleeps in the same bed. 20RT 4792.  This was in defense of the evidence that Weissman would sometimes sleep in the same bed as some of the accusers.  Rebutting this argument, in closing, the prosecutor said: "Mr. Weissman is not a parent. These aren't his children. There wasn't just one bed in the house . . . [a]nd I raise that because . . . there [is] **obviously a difference when parents are sleeping with their child, the mother and father are in a committed heterosexual relationship**. There is a child that is an offspring . . . but if you are talking about a 50-year-old stranger . . . who pulls in an eight-year-old-child . . . and now he is masturbating, well, that changes the circumstantial evidence." 20RT 4792.  (emphasis supplied).

Weissman contends that the prosecutor repeatedly told the jury to convict him "because he had lied about being 'heterosexual' and his 'heterosexuality' . . . and because [his] conduct with children was 'differen[t] because he was not in a 'committed heterosexual relationship.'"  Petition at 40; *see also* 20RT 4792.  He claims that these arguments were "plainly improper and misconduct because they were not based upon evidence at trial, but upon outdated stereotypes and discriminatory arguments that associate gays and lesbians with pedophilia." *Id.*  Weissman asserts that these arguments constituted federal constitutional error in that they "diminish[ed] the personhood of gays and lesbians in violations of the federal constitutional rights to due process, equal protection, and a fair trial." *Id.*  He claims that his defense counsel was prejudicially deficient in not objecting to these arguments, and that the state appellate court was unreasonable in finding otherwise.[24]

---

[24] In support of Weissman's petition, the law firm Jenner & Block LLP, the National Center for Lesbian Rights, and Lambda Legal submitted an amicus brief arguing that I should evaluate the prosecution's closing statements in light of the history of lesbian, gay, bisexual, transgender and queer ("LGBTQ") people being "falsely stigmatized as sexual threats to children."  *See* Brief of Amici Curiae ("Amicus Brief") [Dkt. No. 18-1].  The *amici* point to several California state court cases that show the evolution of this area of legal protection.  Bound as I am by the confines of AEDPA in reviewing Weissman's habeas petition, my duty is to consider whether the state

The state court rejected Weissman's argument on appeal because it found that the prosecutor did not target Weissman's lack of "heterosexual relationships" or link his intent to his "sexual orientation." State Opinion at 43. It determined that the prosecutor had addressed Weissman's lack of any male or female adult sexual relationships, which was not impermissible. *Id.* at 43-44. Because the court determined that the prosecutor had not acted improperly, it did not decide whether the failure to object to the statements in question constituted ineffective assistance of counsel.[25]

The court pointed out that when the prosecutor questioned witnesses, he asked if Weissman had "an intimate partner relationship with a man or a woman" and asked if Weissman had "any consistent adult company" or "an adult relationship" that was "male or female." *Id.* at 43. The prosecutor also asked Weissman's adopted son, Charlie, whether Weissman had ever been in "a dating relationship" with "any man" or "any woman" or had "any kind of adult romantic relationship" during the 22 years that Charlie had known defendant. *Id.* at 44.

The state court determined that the only time that the prosecutor mentioned "heterosexual" relationships was when he argued that Weissman had "expressly represented" himself to the parents of the children he was accused of victimizing as "a heterosexual male" and had similarly represented himself to the police as a heterosexual by lying about Sybill Peters being his girlfriend. State Opinion at 44-45. Among other things, the prosecutor said, "[o]f course there's lies about his heterosexuality . . ." and "[l]iterally from the word go with the police, he's ready to use the same lies of 'I have a heterosexual background. I'm heterosexual. I like women. Your belief that I like boys is unfounded.'" *Id.* at 44.

Overall, the state appellate court was unconvinced by Weissman's argument that the prosecutor had acted improperly. It determined that when the prosecutor was addressing

_____

appellate court ruled in a way that was unreasonable under or contrary to clearly established federal law as explained by the Supreme Court. Because it did not, I must defer to its decision.

[25] Because the state court determined that the prosecutor's arguments were not improper, it determined that defense counsel's decision not to object was not deficient and did not reach the question of whether counsel's failure to object was prejudicial. I examine that finding under the doubly deferential *Strickland*/AEDPA standard, as discussed later in this Order. If necessary, I would review the question of whether the failure to object was prejudicial *de novo.*

Weissman's sexual orientation, he was only doing so in an effort to illustrate Weissman's "false representations" that he had been or currently was involved in adult heterosexual relationships.

### 2.     Legal Standard

#### a.     Commentary on Sexual Orientation

The Supreme Court has not addressed whether reference to a defendant's actual or perceived sexual orientation during closing argument in a child molestation case can be prejudicial to the defendant.  The Ninth Circuit has held that evidence of homosexuality, particularly in cases involving alleged child molestation, can be extremely prejudicial.  *United States v. Gillespie*, 852 F.2d 475, 479 (9th Cir. 1988); *see also Cohn v. Papke*, 655 F.2d 191, 194 (9th Cir. 1981) (introduction of evidence of homosexuality creates a "clear potential that the jury may have been unfairly influenced by whatever biases and stereotypes they might hold with regard to homosexuals").  When the testimony concerning homosexuality is not elicited as the by-product of neutral cross-examination on legitimate issues, it is more likely to be prejudicial.  *See Gillespie*, at 479.  But prosecutorial misconduct cannot be established merely because "the prosecutors' remarks were undesirable or even universally condemned"— the prosecutor's comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

#### b.     Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not just assistance, but effective assistance, of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  *Id.* In order to prevail, a petitioner must establish (1) that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, *Strickland*, 466 U.S. at 687-88, and (2) that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694; *Andrus*, 140 S Ct. at

36

1881.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.
*Id.*  Where a petitioner has failed to meet the *Brecht* standard of harmlessness, discussed earlier in
Section I.A.2, the Ninth Circuit has held that the petitioner necessarily "cannot meet the higher
*Strickland* standard of prejudice."  *Kipp v. Davis*, 971 F.3d 866, 878 (9th Cir. 2020) (citing *Kyles*,
514 U.S. at 435–36).

AEDPA "erects a formidable barrier to federal habeas relief." *Burt v. Titlow*, 571 U.S. 12,
13 (2013).  The barrier is even more formidable when seeking relief on an ineffective assistance
claim.  "In fact, even if there is reason to think that counsel's conduct 'was far from exemplary,' a
court still may not grant relief if '[t]he record does not reveal' that counsel took an approach that
no competent lawyer would have chosen." *Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021) (quoting
*Titlow*, 571 U.S. at 23-24.)

The standards created by *Strickland* and § 2254(d) are "highly deferential." *Strickland*, 466
U.S. at 689.  "This analysis is 'doubly deferential' when, as here, a state court has decided that
counsel performed adequately." *Reeves*, 141 S. Ct. at 2410; accord *Knowles v. Mirzayance*, 556
U.S. 111, 123 (2009).  "[I]n reviewing the work of their peers, federal judges must begin with the
'presumption that state courts know and follow the law.'" *Reeves*, 141 S. Ct. at 2411 (quoting
*Woodford v. Visciotti*, 537 U. S. 19, 24 (2002)).  "[A] federal court may grant relief only if every
'fairminded juris[t]' would agree that every reasonable lawyer would have made a different
decision." *Id.* (quoting *Richter*, 562 U. S. at 101.) When § 2254(d) applies, "the question is not
whether counsel's actions were reasonable.  The question is whether there is any reasonable
argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

### 3.   Analysis

In light of those standards, the question is whether the prosecutor's comments about
Weissman's sexual orientation were such that every reasonable defense counsel would have
objected to his comments involving Weissman's sexual orientation.  Because the state appellate
court found that defense counsel was not deficient in failing to object to the statements in question,
its decision is owed double deference.

As an initial matter, the state appellate court found that the only times the prosecutor

referenced Weissman's sexual orientation were in the context of pointing out inconsistencies between how Weissman portrayed himself to children and their parents and what the truth was. *Supra* D(2).  But the court did not discuss the statement quoted in the first paragraph of the Background section, which Weissman identifies as the "perhaps most egregious[]" instance of improper reference to sexual orientation.  Petition 45:24-28.  Weissman argues that this comment was particularly improper because it suggested that Weissman's lack of a "'committed heterosexual relationship'" "made him different." Petition 45:24-28.

The context of the prosecutor's argument shows that he was differentiating between a non-family member adult male sleeping in the same bed as a young boy and a parent sleeping with their child in the same bed.  That is a fair contrast.  It was not targeted at homosexuality or non-heterosexual relationships, and it did not rise to such a level of impropriety that defense counsel's performance "fell below the objective standard of reasonableness" in not objecting to it.

There is no clearly established federal law holding that prosecutors cannot comment on how a defendant held themselves out to be a heterosexual in an effort to gain the trust of children or children's parents.  The cases Weissman relies upon—*United States v. Gillespie*, 852 F.2d 475, 479 (9th Cir. 1988), and *Cohn v. Papke*, 655 F.2d 191, 194 (9th Cir. 1981)—concerned very different circumstances and are distinguishable on both the facts and the law.  Both cases involved prosecutors introducing evidence of defendants' homosexuality as proof that they could commit the offenses of which they were accused.[26]

---

[26] Weissman also draws many comparisons between this case and *Zapata v. Vasquez*, 788 F.3d 1106 (9th Cir. 2015), which held that a prosecutor's use of inflammatory, biased words in closing argument was misconduct, and that defense counsel's failure to object was prejudicial ineffective assistance of counsel.  This case differs markedly from *Zapata.*  There, the prosecutor invented racial slurs that he claimed the defendant had shouted at a homicide victim before he killed him, and repeatedly used those slurs in closing, asking the jury to "imagine" that those were the last words they heard before they were killed.  The Ninth Circuit found ineffective assistance of counsel for failure to object to remarks that were "fabricated from whole cloth," and "designed to inflame the passions of the jury." *Id.* at 1115-16.

The Supreme Court has held that "the Constitution prohibits racially biased prosecutorial arguments," *see McClesky v. Kemp*, 481 U.S. 279, 309 n. 30 (1987), but has never held the same for prosecutorial arguments that are biased against non-heterosexuals.  The Court has also found no prosecutorial misconduct despite extremely inflammatory statements by prosecutors in closing arguments comparing defendants to animals and stating that the prosecutor wished that the defendant were dead.  *See Darden v. Wainwright*, 477 U.S. 168 (1986) (where the Court found no

1      Weissman leans on *United States v. Gillespie* for the principle that introduction of

2   evidence of a defendant's homosexuality is federal constitutional error.  Petition at 43.  Weissman

3   appears to argue this is the same kind of error that occurred in his case and is the type against

4   which his defense counsel should have raised an objection.

5      In *Gillespie*, the defendant was convicted of causing the transportation of a person—a

6   three-year-old girl—in interstate and foreign commerce for illegal sexual purposes, and indirectly

7   importing an alien for immoral purposes.  The trial court admitted various witnesses' testimony

8   indicating that the defendant and another man had a homosexual relationship.  There was no

9   connection between that fact and the underlying offenses.  This error was compounded by the

10  admission of expert testimony on characteristics "common to child molesters," as well as expert

11  testimony that lacked scientific reliability concerning play therapy with anatomically correct dolls.

12  The Ninth Circuit reversed.

13     On appeal, the government had argued that the prosecutor had presented evidence that the

14  two men slept in the same bed not to show that the defendant was more likely to sexually abuse a

15  child because he was a homosexual, but to show motive or intent.  The Ninth Circuit determined

16  that admission of the evidence was not justified under Rule 404(b) because the evidence of

17  homosexuality neither proved nor disproved that the defendant molested the child, yet the

18  government repeatedly asked pointed questions over objections about the two men's sleeping

19  arrangement.[27]  And since evidence of homosexuality can be very prejudicial, *see Cohn v. Papke*,

20  655 F.2d 191, 194 (9th Cir. 1981), and the verdict depended upon the jury's assessment of the

21  defendant's credibility and character, the prosecutor's conduct was not harmless error.  *Gillespie*,

22  852 F.2d at 479.

23  _____

24  prosecutorial misconduct despite the prosecutor's statement in closing argument expressing his
    desire to "see [the defendant] sitting here with no face, blown away by a shotgun").

25  [27] The Ninth Circuit rejected the government's argument that admission of the evidence of
26  homosexuality was harmless because the trial court gave a limiting instruction, stating that the
    case was "centered around the appellant's denial of . . . eyewitness testimony," and for that reason
    "[t]he verdict probably depended on the jury's assessment of the credibility and character of the
27  appellant and [the eyewitness]."  *Gillespie*, 852 F.2d at 479.  Under such circumstances, the court
    concluded, the trial court's curative instruction to the jury was "not sufficient to obviate the
28  prejudice[,]" making the admission of evidence of homosexuality not harmless error.  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

Weissman also relies on *Cohn v. Papke*, 655 F.2d 191 (9th Cir. 1981).  Cohn brought a civil rights action against police officers who had arrested him on the charge that he had solicited an officer to engage in a homosexual act.  During trial, the police officers' counsel asked Cohn, "By the way, Mr. Cohn, are you bisexual?"  He sought to elicit testimony concerning Cohn's prior sexual experiences and to submit psychiatric reports concerning those experiences and Cohn's sexual preferences.  *Id.* at 192.  The basis for this, according to that counsel, was to impeach Cohn's claim that he was not homosexual or bisexual and therefore not "physically capable" of committing a homosexual act. *Id.* at 193.  But at no point in the trial had Cohn claimed to be heterosexual, nor had he claimed that he could not have solicited the sex act.  The Ninth Circuit found that the only reason for introducing the evidence was to show that it was within his character as a homosexual to solicit sex acts from a male police officer, which made it improper under Rule 404 of the Federal Rules of Evidence.  And the evidence should have been excluded under Rule 403 because its probative value was substantially outweighed by the danger of unfair prejudice.  There was "clear potential that the jury may have been unfairly influenced by whatever biases and stereotypes they might hold with regard to homosexuals or bisexuals[.]" *Id.* at 194.

In this case, the state court reasonably determined from the record that it was Weissman who introduced his sexuality in order to establish credibility with the parents of his victims.  State Opinion at 44-45.  It was relevant for the prosecutor to point out that he had no known adult romantic relationships, male or female.  He was not raising an irrelevant claim of homosexuality, as in *Gillespie*, or an arguably irrelevant and obviously prejudicial claim, as in *Cohn*.  Evidence of homosexuality is what the Ninth Circuit has found objectionable in closing argument and elsewhere.  *See Gillespie*, 853 F.2d 475, 479; *Cohn*, 655 F.2d 191, 194.  In this case, the prosecutor did not introduce evidence of homosexuality at all.  And his statement about heterosexuality in closing was a minor part of his argument in any event.  *Gillespie* and *Cohn* do not support Weissman's claim.

Given the deference owed to the state court under AEDPA, and double deference owed given its finding that defense counsel did not perform deficiently, Weissman is not entitled to federal habeas relief on this claim.

### B.     Failure to Investigate Records of T.B.'s Arrest

#### 1.     Facts

On July 6, 2016, about three weeks before jury selection in Weissman's trial, 13-year-old T.B. was arrested in Fresno County for stealing a purse from his foster mother's niece.  State Opinion at 40.  He admitted to taking the purse, was charged by Fresno County with felony grand theft, and the charge was dismissed 19 days later per the request of the probation department.  *Id*. The prosecutor apparently learned at some point before trial about the Fresno County case from a Santa Cruz County social worker, at which point he informed Weismann's trial counsel about the "outstanding theft case" against T.B.  *Id.*

During trial, Weissman's trial counsel raised several concerns about T.B.'s ability to tell the truth.  On August 16, 2016, the trial court determined that a hearing outside the presence of the jury was necessary to determine whether T.B. should be allowed to testify.  Dkt. No. 9-5, Ex. 2, 808-892.  The primary reason for this hearing was so that the court could evaluate how T.B. was going to describe certain events.  The court was concerned with T.B.'s capacity to testify clearly in front of a trier of fact, particularly given T.B.'s history with hallucinations and antipsychotic medications.  While discussing whether to hold the hearing, Weissman's counsel also told the court that T.B. was "recently arrested and we don't know what for and we have to look at whether or not there is evidence that would be admissible for impeachment purposes." State Opinion at 40-41; Dkt. No. 9-5, Ex. 2, 808-892.  The court acknowledged this, among the other concerns Weissman's counsel and the court itself had raised, and ordered the hearing.  Throughout the course of the hearing, T.B. was examined on various topics by Weissman's lawyer but was not asked about the arrest.[28]

Although T.B. was impeached in several ways at trial, Weissman's counsel did not ask T.B. about the arrest.  *Id.*  In his new trial motion, Weissman asserted that his counsel had been prejudicially deficient in failing to raise issues about T.B.'s arrest as impeachment.  The trial court found that the jury's rejection of the other strong challenges to T.B.'s credibility meant that the

---

[28] The Section 402 hearing that the trial court held to investigate T.B.'s credibility was held outside the presence of a jury.

1  trial counsel's decision not to present the theft evidence was reasonable.

2      On appeal, the state court evaluated Weissman's claims under the *Strickland* standard.  *See*

3  State Opinion at 42-43.  The court decided:

> The record in this case does not establish that it was an unreasonable strategic choice for
> defendant's trial counsel to decide not to pursue further investigation of T.B.'s arrest for
> theft. Defendant's trial counsel chose to concentrate his impeachment of T.B.'s testimony
> on T.B.'s history of lying and hallucinations. Evidence that 13-year old T.B. had stolen from
> his foster mother and her niece would not have added anything of significance to this
> impeachment. For the same reason, defendant cannot establish that his trial counsel's choice
> was prejudicial. Our confidence in the outcome is not shaken by the absence of this
> impeachment evidence, which was minor in comparison to the other evidence used to
> impeach T.B.

Answer Ex. 6 at 43.

### 2.    Legal Standard

See Section II.A.2.b, above.

### 3. Analysis

Weissman argues that his counsel's failure to investigate was not a sound tactical decision:

it is "well-settled that although courts defer to reasonable strategies of defense counsel, counsel

has the 'duty to make reasonable investigations or to make a reasonable decision that makes

particular investigations unnecessary[,]'".  Petition at 64 (quoting *Strickland*, 466 U.S. at 691); *see*

*also Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017) ("Counsel cannot justify a failure to

investigate simply by invoking strategy.")

Weissman overreads *Strickland.*  It involved a claim of ineffective assistance of counsel

based on failure to investigate but it did not create a bright-line rule dictating how counsel should

approach investigations.  The relevant inquiry is not what counsel could have done, but rather

whether the choices made by counsel were reasonable.  As already noted, judicial scrutiny of

counsel's performance must be highly deferential, and a court must indulge a strong presumption

that counsel's conduct falls within the wide range of reasonable professional assistance.  *See*

*Strickland*, 466 U.S. at 689.  The analysis here is doubly deferential because the state court found

that defense counsel performed adequately.  *See Reeves*, 141 S. Ct. at 2410; accord *Knowles v.*

*Mirzayance*, 556 U.S. 111, 123 (2009).

The state appellate court determined that the record did not show that it was an

1  unreasonable strategic choice for Weissman's trial counsel to forego further investigation of T.B.'s

2  arrest for theft. State Opinion at 43. It would have taken defense counsel a significant amount of

3  time and resources to obtain more information about T.B.'s arrest through the juvenile court

4  system, *see* 5CT 1048, 1073, and counsel had access to many other sources of impeachment that

5  he could use during T.B.'s cross examination. State Opinion at 43. He chose to concentrate his

6  impeachment of T.B.'s testimony on the boy's history of lying and hallucinations. *Id.* Particularly

7  given the nature of the charges, and the kind of impeachment that Weissman's counsel sought, this

8  was a reasonable choice; "every fairminded juris[t]" would not agree that every reasonable lawyer

9  would have made a different decision, and Weissman points to nothing that suggests otherwise.

10  *See Dunn v. Reeves*, 141 S. Ct. at 2411.

11      It was not unreasonable under or contrary to federal law for the state appellate court to

12  conclude that Weissman's trial counsel did not provide him with ineffective assistance when he

13  chose not to investigate T.B.'s theft charge further. It is owed deference under AEDPA. For that

14  reason, I will not reach the question of prejudice. Weissman is not entitled to federal habeas relief.

15  **III.   OMISSION OF MULTIPLE VICTIM ENHANCEMENT INSTRUCTION**

16          **1.    Background**

17      Weissman claims, separately from his prosecutorial misconduct and ineffective assistance

18  of counsel claims, that the trial court's failure to give any instruction defining the elements of

19  multiple victim enhancement was structural error, and that the state appellate court's holding to

20  the contrary was clearly unreasonable. Petition at 66:7-9.[29]

21      The trial court did not instruct the jury with CALCRIM No. 3181 or give any other

22  instruction on the multiple victims circumstance allegation, yet the jury returned a verdict on the

23  multiple victims circumstance: "'We, the jury in the above-entitled case, having found the

24  defendant guilty of felony offenses in violation of Penal Code section section [sic] 288 subdivision

25  (a), as described in Penal Code section 667.61 (c), find the special allegation that the defendant

26  committed an offense against more than one victim, to be TRUE pursuant to Penal Code Section

27  ─────────────────

28  [29] This claim only affects the enhancements to Weissman's convictions, not the convictions
themselves.

667.61 (b) (c) (e).'" Petition at 67:7-11, Ex. A at 52.

CALCRIM No. 3181 states:

If you find the defendant guilty of two or more sex offenses, as charged in Counts <*insert counts charging sex offense[s] from* Pen. Code, § 667.61(c)>, you must then decide whether the People have proved the additional allegation that those crimes were committed against more than one victim in this case.  The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find that this allegation has not been proved. . . The court has a sua sponte duty to give this instruction on the sentencing factor when charged.

CALCRIM No. 3181 Sentencing Factors - Multiple Victims (Pen. Code, § 667.61 (e) (4)).

The trial court found that its omission of this instruction was inadvertent.  After Weissman raised the issue in his motion for new trial, the trial court ruled that despite the omission, "[t]here was no confusion as to the jury's findings regarding multiple victims . . . [e]ven looking at this in the worst light . . . it was harmless error." 25RT 6010-6011.  The state appellate court agreed. It wrote:

Defendant contends that the court's failure to instruct on the multiple victims circumstance was a "structural" error that requires reversal per se. Yet he identifies no basis for deeming this instructional error structural. The multiple victims circumstance was properly charged, and the jury returned a proper verdict on it. The verdict form itself required the jury to make precisely the findings that the instruction would have required it to make. We can see no basis for finding the error structural.  The very simple instruction omitted by the trial court would not have required the jury to do anything more than the verdict form required it to do. The trial court's error was harmless beyond a reasonable doubt.

State Opinion at 53.

## 2. Legal Standard

A jury instruction that omits an element of an offense is constitutional error subject to "harmless error" analysis.  *See Neder v. United States*, 527 U.S. 1, 8-11 (1999) (direct review); *Evanchyk v. Stewart*, 340 F.3d 933, 940 (9th Cir. 2003) (§ 2254 case).  Harmless error applies whether the error is characterized as a misdescription of an element of an offense in a jury instruction or as an omission of the element.  *See California v. Roy*, 519 U.S. 2, 5 (1996) (omission of "intent" element from aiding and abetting instruction subject to harmless error analysis where jury could have found intent based on evidence it considered).

The omission of an instruction is less likely to be prejudicial than a misstatement of the law.  *See Walker v. Endell*, 850 F.2d at 475-76 (*citing Henderson v. Kibbe*, 431 U.S. 145 (1977)).  Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an

"'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155). The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given. *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156); *see id.* at 972 (due process violation found in capital case where petitioner demonstrated that application of the wrong statute at his sentencing infected the proceeding with the jury's potential confusion regarding its discretion to impose a life or death sentence).

The omission will be found harmless unless it "'had substantial and injurious effect or influence in determining the jury's verdict." *Roy*, 519 U.S. at 4 (quoting *Brecht*, 507 U.S. at 637); *see Roy v. Gomez*, 108 F.3d 242, 242 (9th Cir. 1997) (on remand after *California v. Roy*). A habeas petitioner is not entitled to relief unless that *Brecht* standard is met. *Brecht*, 507 U.S. at 637 ((quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." *Id.*; *see, e.g. Coleman v. Calderon*, 210 F.3d 1047, 1051 (9th Cir. 2000) (finding *Brecht* error where "at the very least, we 'cannot say with fair assurance . . . that the judgment was not substantially swayed by the [instructional] error.'").

Where the trial court simply fails to alert the jurors that they must consider an element of the crime, the omission is harmless if review of the facts found by the jury establishes beyond a reasonable doubt that the jury necessarily found the omitted element. *See Uchimura v. United States*, 125 F.3d 1282, 1287 (9th Cir. 1997) (applying plain error analysis on direct review of a federal criminal conviction); *see, e.g., Neder*, 527 U.S. at 15-20 (error harmless because "the omitted element was uncontested and supported by overwhelming evidence"); *see also Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008) (positively referencing *Neder* for the principle that harmless-error analysis applies to instructional errors so long as the error does not categorically "'vitiat[e] all the jury's findings.'").

Ultimately, the proper question in assessing harm in a habeas case is: "'Do I, the judge, think that the error substantially influenced the jury's decision?'" *O'Neal v. McAninch*, 513 U.S.

United States District Court
Northern District of California

1    432, 436 (1995).  If the court is convinced that the error did not influence the jury, or had but very

2    slight effect, the verdict and the judgment should stand.  *Id.* at 437.  If, on the other hand, the court

3    is not fairly assured that there was no effect on the verdict, it must reverse.

### 3. Analysis

5         The appellate court's holding was not contrary to clearly established federal law governing

6    the omission of an element of an offense from jury instructions.  Weissman claims that "the

7    complete failure to instruct on the elements of the multiple victim enhancement was structural

8    error," but as the Supreme Court held in *Neder* and reaffirmed in *Hedgpeth*, most instructional

9    errors are not structural, so long as the error does not "vitiat[e] all of the jury's findings."

10   *Hedgpeth*, 555 U.S. at 61; *see also Neder*, 527 U.S. at 15-20.

11        The omission here did not vitiate the jury's findings.  The missing instruction would have

12   told the jury that the State must "prove the additional allegation that [the] crimes were committed

13   against more than one victim in this case" and it must prove that "beyond a reasonable doubt."

14   The jury had already received an instruction from the trial court that "whenever [the trial court]

15   tell[s] you the People must prove something, I mean they must prove it beyond a reasonable

16   doubt." 19RT 4528.  The verdict form asked whether Weissman had committed crimes against

17   more than one victim.  The jury found that Weissman had committed violations of the Penal Code

18   section to which the instruction would have applied, (§ 288(a)), against multiple victims.  It came

19   to its conclusions using the trial judge's prior instruction and its finding that Weissman had

20   committed violations against multiple victims.

21        In his petition, Weissman points to *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and its

22   progeny to argue that the Sixth Amendment right to a jury finding on elements requires that any

23   fact that increases punishment must be found by a jury beyond a reasonable doubt, regardless of

24   whether that fact is part of the crime or whether it is an "enhancement." *See also Alleyne v. United

25   States*, 570 U.S. 99, 109 (2013); *Blakely v. Washington*, 542 U.S. 296, 303-306 (2004).  The state

26   court's holding is not contrary to or an unreasonable interpretation of those cases because the state

27   appellate court reasonably held that the jury did find beyond a reasonable doubt that Weissman

28   had violated § 288(a) against multiple victims and did so by making the precise findings on the

United States District Court
Northern District of California

46

1    verdict form that CALCRIM 3181 would have instructed them to do.  3CT 684.  The state court

2    reasonably found that the other instructions given by the trial court were sufficiently clear that the

3    omission of the instruction was harmless error.

4            The state court's decision was not so lacking in justification that it was beyond any

5    possibility for fair minded agreement.  On the record, it was not unreasonable or contrary to

6    federal law for the state court to find the omission harmless error under *Chapman*.  The error did

7    not have substantial and injurious effect on the jury's verdict, meaning that the omission did not

8    exceed the harmless error standard set out by *Brecht*.  And since federal habeas relief for omission

9    of an instruction is only available if the petitioner shows prejudice under *Brecht*, Weissman is not

10   entitled to federal habeas relief.

11   **IV.   PREJUDICIAL CUMULATIVE ERRORS**

12           Petitioner contends that the multiple constitutional errors were cumulatively prejudicial

13   and the state court's contrary finding was unreasonable, because the errors at least cumulatively

14   had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507

15   U.S. at 637.  I disagree.

16                        **1.    Background**

17           The state court rejected Weissman's prejudicial cumulative error claim, stating only the

18   following: "Defendant claims that we should reverse due to cumulative prejudice. However,

19   except for the *Napue* error that requires reversal of nine counts, we have found no other significant

20   errors that caused any prejudice.  Consequently, we reject his cumulative prejudice argument."

21   State Opinion at 51.  The question, pursuant to AEDPA's rules governing federal habeas review,

22   is whether the state court reached a conclusion that was unreasonable or contrary to clearly

23   established Supreme Court law—here, *Chambers v. Mississippi*, 410 U.S. 284 (1973).

24                        **2.    Legal standard**

25           The Supreme Court has clearly established that the combined effect of multiple trial court

26   errors violates due process where it renders the resulting criminal trial fundamentally unfair.

27   *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers*, 410 U.S. at 298).  The

28   cumulative effect of multiple errors can violate due process even where no single error rises to the

United States District Court
Northern District of California

47

level of a constitutional violation or would independently warrant reversal. *Chambers*, 410 U.S. at 290. "Under traditional due process principles, cumulative error warrants habeas relief only where the errors have so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parle*, 505 F.3d at 927 (internal quotation marks omitted). Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence on the jury's verdict." *Brecht*, 507 U.S. at 637 (internal quotations omitted).

Cumulative error is more likely to be found prejudicial when the government's case is weak. *See U.S. v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see, e.g. United States v. Preston*, 873 F.3d 829, 846 (9th Cir. 2017) (noting the government's case "hinged almost entirely on [the victim's] testimony with "little additional proof to corroborate his allegations"). There can be no cumulative error when there has not been more than one constitutional error. *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012).

When a state court decides that there was no prejudicial cumulative error, a federal habeas court should review that decision "to determine whether the decision of the state court was an objectively unreasonable application of *Chambers v. Mississippi . . . Taylor v. Kentucky . . .* or other relevant Supreme Court precedent." *Parle v. Runnels*, No. 05-16610, 177 Fed. Appx. 759 (9th Cir. 2006) (unpublished).

### 3. Analysis

The state appellate court's conclusion that no prejudicial cumulative error occurred is not unreasonable under or contrary to clearly established federal law. Weissman's case is very different than cases where the Supreme Court and other courts in this circuit have found prejudicial cumulative error.

*Chambers v. Mississippi* was the first cumulative-error decision by the Supreme Court. The case arose after a police officer was shot and killed. *Chambers*, 410 U.S. at 285. When he was shot, but before he died, the officer appeared to fire his weapon at Chambers, hitting him in the head and neck. *Id.* at 287. The prosecutor accused Chambers of shooting the officer and charged him with murder; Chambers pleaded not guilty, stating that he had not fired any shots. *Id.* Later, a third party claimed that he had been the one to shoot the officer, not Chambers; he stated

United States District Court
Northern District of California

as much in a signed, voluntary confession.  *Id.*  Then, in court, the third party repudiated his

confession.  Chambers' defense was that he had not shot the officer, the third party had.  *Id.* at

287-88.  But throughout the course of the trial, the state court prevented Chambers from advancing

that theory.  It refused to allow him to cross-examine the third party and prevented him from

introducing witness testimony swearing that the third party had admitted to shooting the officer.  It

told the jury to disregard other exculpatory witness testimony. *Id.* at 288-92.

The Supreme Court held that Chambers' right to due process of law was violated by the

collective impact of not being able to cross-examine the third party and being prevented from

introducing exculpatory testimony.  *Id.* at 294-95.  It focused on the fundamental nature of the

right of the accused to present witnesses in his own defense.  It was careful to emphasize that its

decision did not establish any new principles of constitutional law or signal a diminution in respect

for the States' criminal trial procedures, but rather "quite simply . . . under the facts and

circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." *Id.* at

303.

The child molestation cases where courts have found prejudicial cumulative error pursuant

to the standard set by the Supreme Court in *Chambers* typically involve far less corroborating

evidence, more prejudicial prosecutorial misconduct or trial court error, and much stronger

evidence of prejudice than in this case.  For instance, in *United States v. Preston*, where defendant

was convicted on two counts of aggravated sexual abuse of a child, the evidence against the

defendant was notably weak and the trial errors were extreme.  873 F.3d 829 (9th Cir. 2017).

There, the defendant was an assistant baseball coach who arranged for a young boy, Rosenberg,

whom he knew from his neighborhood, to join his team.  *Id.* at 833.  Rosenberg would sometimes

stay overnight at the defendant's house.  *Id.* As an adult, Rosenberg told his mother and a

therapist, separately, that the defendant had molested him during those sleepovers, but provided no

details.  *Id.*  When an investigation was launched into the accusations, Rosenberg told FBI agents

details about the alleged molestation; defendant denied the allegations.  *Id.*  At trial, the only direct

evidence offered to the jury was Rosenberg's testimony.  The defendant did not testify.  *Id.*  The

jury found him guilty on two counts.

On a petition for federal habeas relief, the Ninth Circuit reversed because of the cumulative effect of several significant trial errors. Three of the most significant were: (1) a therapist offered her "professional opinion" that Rosenberg was not lying about the sexual abuse, bolstering his credibility, and also opined on the credibility of sex abuse allegations against men in general; (2) defendant's ex-wife testified that she had witnessed defendant masturbating while looking at a photograph of his eight-year-old stepson five years after he had allegedly abused Rosenberg; and (3) the prosecutor commented in closing argument on the defendant's failure to testify in violation of clearly established Supreme Court law protecting a criminal defendant's Fifth Amendment right against self-incrimination. *Id.* at 837-39. Because the verdict in *Preston* hinged entirely on whether the jury believed Rosenberg's testimony, the court determined that the cumulative error was prejudicial because three of the errors involved statements asserting or implying that Rosenberg's testimony was true, and the other errors involved statements asserting or implying that the defendant's denial was false.

In contrast, the case against Weissman did not hinge on the testimony of a single child. It hinged on (i) the testimony of several children, all of whom provided similar accounts of the nature of their relationships with Weissman, (ii) the corroborating evidence from those children telling their parents about Weissman's attacks, and (iii) Weissman's own admission that he had masturbated in bed with one of the accusers, verifying the boy's testimony. The types of trial error at issue were not as extreme as the types of error in *Preston*, or the types of error in *Chambers* that led federal courts to grant habeas relief. In those cases, and other similar cases, the cumulative errors infected the trial with unfairness to an extent that conviction amounted to a denial of due process. *See, e.g. Alcala v. Woodford*, 343 F.3d 862 (9th Cir. 2003) (where federal habeas relief was granted in a capital case because defense counsel was prejudicially deficient in failing to call an alibi witness, exclusion of testimony violated petitioner's right to a fair trial, and admission of irrelevant evidence violated due process). The same is not true here. Weissman had a chance to introduce exculpatory evidence, his accusers were thoroughly examined and even impeached in front of the jury, prosecutorial errors were subject to evidentiary hearings, and the trial court error was minor.

The state appellate court was not acting unreasonably under or contrary to clearly established federal law when it determined no prejudicial cumulative error had occurred.  Federal habeas relief is denied.

## CONCLUSION

The state appellate court's adjudication of Weissman's claims did not result in decisions that were contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Accordingly, the petition is DENIED.

A certificate of appealability will issue.  Reasonable jurists could "find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Weissman may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: December 21, 2023

William H. Orrick
United States District Judge

United States District Court
Northern District of California